[DO NOT PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT
_____

No. 12-11119
_____

D.C. Docket Nos. 9:11-cr-80078-DMM-2,
9:11-cr-80078-DMM-1

UNITED STATES OF AMERICA,

Plaintiff/Appellee,

versus

WINSKY MONDESTIN,
KERBY AURELHOMME,

Defendants/Appellants.

_____

Appeals from the United States District Court
for the Southern District of Florida

_____

(August 28, 2013)

Before  TJOFLAT and WILSON, Circuit Judges, and COOGLER,[*] District Judge.

PER CURIAM:

Winsky Mondestin and Kerby Aurelhomme each appeal their convictions and total 300-month sentences following a joint trial. Both defendants were convicted of conspiracy to commit Hobbs Act robbery, in violation of 18 U.S.C. § 1951 (Count One); Hobbs Act robbery (Count Two); using, carrying, brandishing, or discharging a firearm in relation to a crime of violence, in violation of 18 U.S.C. § 924(c)(1)(A) (Count Three); and making false statements of material fact to investigators, in violation of 18 U.S.C. § 1001(a)(2) (Counts Four through Six). For the reasons that follow, we reverse the convictions with regard to Count Three. We find the challenges to the remaining counts without merit and therefore do not address them in this opinion.

## I.    BACKGROUND

Co-defendants Mondestin and Aurelhomme were indicted on a six-count superseding indictment alleging they were responsible for a July 12, 2006 robbery of an armored van in Boca Raton, Florida. Aurelhomme was employed by the armored van company and was the assigned driver of the van on the morning of the robbery. Gustavo Sorzano was the other guard on duty at the time.

---

[*] Honorable L. Scott Coogler, United States District Judge for the Northern District of Alabama, sitting by designation.

On the morning of the robbery, Aurelhomme and Sorzano received a manifest that listed several automatic teller machines ("ATMs") they were responsible for servicing that day. After they headed out, Sorzano reversed the order of their stops due to traffic, and he instructed Aurelhomme to begin with the ATM at the Cumberland Farms convenience store and gas station. The two arrived at Cumberland Farms shortly after nine o'clock that morning. Upon their arrival, Sorzano went inside the store to service the ATM while Aurelhomme waited in the van.

Sorzano spent approximately thirty minutes servicing the ATM inside Cumberland Farms. As he was leaving the store, an armed assailant attacked Sorzano and threw him into the back of the van. Sorzano yelled for Aurelhomme to cut off the engine and call the police, but instead Aurelhomme remained silent and began driving.[1] Sorzano and the assailant struggled in the back of the van as it was driving away. During the struggle the assailant's gun discharged, striking Sorzano in the ankle. A few minutes later, the van stopped at a nearby apartment complex and the assailant began unloading the bags of money. Sorzano could not see anyone outside the van helping unload the money, but he was aware of another car. Sorzano later testified that he believed the attacker had a partner considering how

---

[1] Aurelhomme later explained his behavior by claiming a second robber was holding him at gunpoint in the front seat.

3

quickly he unloaded the twenty bags of money into the getaway car and drove away. Once the assailant and the car were gone, Sorzano called 911. Sorzano was then taken to the hospital, where he was informed by doctors that he had suffered a heart attack as a result of the attack.

Investigators began suspecting Aurelhomme's involvement in the robbery based on his unusual behavior and suspicious responses in a post-robbery interview. For example, Aurelhomme initially told investigators that the robbers had taken his cell phone. However, when investigators requested the phone's number so they could track it, Aurelhomme claimed he could not remember the number as he had just obtained the phone the previous evening at a night club. Aurelhomme initially could not provide names of people who he had called or who might know his number, and the numbers he eventually provided were inoperable. Aurelhomme's phone number was later established through various means, including a statement and phone records from Elier Cruz, Aurelhomme's employer, who told investigators that Aurelhomme had called him from his usual phone number when he arrived at work on the morning of the robbery.

Mondestin was implicated in the crime through cell phone records, which showed twenty-three phone calls between Aurelhomme and Mondestin on the morning of the robbery, nine of which were made while Sorzano was servicing the ATM. Additionally, cell tower analysis showed that Mondestin and Aurelhomme's

4

phones were using the same cellular tower and the same sector at various time intervals during and preceding the robbery. Like Aurelhomme, Mondestin acted suspiciously when questioned by authorities. For example, Mondestin denied ownership of the phone number investigators had linked to him, claiming instead that it belonged to "Johnny." Yet, upon further inquiry, Mondestin was unable to provide any information to establish "Johnny's" identity. Further, Mondestin initially claimed another phone number belonged to him, but later backtracked and told investigators the phone had been dropped in water and was no longer operable. Although investigators determined that Mondestin was a co-conspirator in the robbery, they did not believe he was the armed assailant that attacked and shot Sorzano. Instead, investigators were led to believe that James Theoc, Mondestin's older brother, was the armed assailant. Theoc died of natural causes before this case went to trial.

At the conclusion of the trial, but before closing arguments, the court conferred with counsel regarding jury instructions. With respect to Count Three—which charged the defendants with using a firearm in relation to a crime of violence—the government sought to establish accomplice liability since neither defendant individually carried a weapon. Two theories were discussed: (1) an aiding and abetting theory, requiring the government prove the defendant knew that a firearm was being used by a co-conspirator and that the defendant committed

some act in furtherance of the offense;[2] and (2) a *Pinkerton*[3] theory of liability, which requires only that the use of the firearm was reasonably foreseeable. The government requested an instruction under both theories, but the district court denied the request for a *Pinkerton* instruction. The parties then argued their theories of the case to the jury with the understanding that the jury would be instructed only on aiding and abetting.

After closing arguments, the district court instructed the jury on the indicted crimes, including the 18 U.S.C. § 924(c)(1)(A) charge in Count Three. Then, consistent with its representation to the parties, the court instructed the jury as follows:

> It is possible to prove a defendant guilty of a crime even without evidence that the defendant personally performed every act charged. . . . .
> [A] defendant aids and abets a person if the defendant intentionally joins with the person to commit a crime.
> A defendant is criminally responsible for the acts of another person if the defendant aids and abets the other person.
> . . . .
> But finding the defendant is criminally responsible for the acts of another person requires proof that the defendant intentionally associated with or participated in the crime, not just proof that the

---

[2] To prove aiding and abetting a § 924(c) offense, the government must show that the substantive offense of carrying or using a firearm in relation to a crime of violence was committed, "that the defendant associated himself with the criminal venture, and that he committed some act which furthered the crime." *United States v. Hamblin*, 911 F.2d 551, 557 (11th Cir. 1990). Additionally, the government must present evidence proving that defendant had the "knowledge required to convict him under section 924(c)." *Id.* at 558. *See also United States v. Thomas*, 987 F.2d 697, 702 (11th Cir. 1993).

[3] *Pinkerton v. United States*, 328 U.S. 640, 66 S. Ct 1180 (1946).

defendant was simply present at the scene of the crime or knew about it.

During deliberations, the jurors sent a note to the court with three questions regarding the legal standard applicable to Count Three's firearm charge:

> Question 1: Does Count 3 mean the defendants themselves have to possess the firearm to be found guilty of the charge?
> Question 2: If the defendants were aware that the firearm was to be used in the crime, they are guilty of Count 3?
> Question 3: Does it even matter if the defendants had knowledge of a firearm to be used?

The district court sought input from the parties on how to respond. Counsel for the government suggested the court refer the jurors back to the previous instruction on aiding and abetting, "especially in light [of] the fact that the *Pinkerton* charge was not given." The attorneys for both defendants similarly suggested the court simply refer the jury to the original instruction.

Instead of following the recommendations from counsel, the district court formulated the following response:

> 1. A person does not have to personally possess the firearm to be guilty of Count Three.
> 2. A person can be found guilty of Count Three if that person aids and abets a person who uses the firearm.
> 3. A co-conspirator can be found guilty of Count Three *if it is reasonably foreseeable* that another conspirator would use the gun in connection with the crime.

Both defendants objected to the proposed supplemental instruction, again insisting the court simply refer to its previous charge. The court, however, overruled their

7

objections and sent a note to the jury with the supplemental instruction as described to the parties.

After deliberating for approximately four more hours, the jury returned a verdict finding both Aurelhomme and Mondestin guilty of all counts for which they were charged.

## II.    DISCUSSION

In this consolidated appeal, Aurelhomme and Mondestin have challenged, on various grounds, all five counts for which they were convicted. After thoroughly weighing each argument presented, we are only persuaded by the defendants' arguments with respect to their convictions under Count Three. The convictions on all other counts are due to be affirmed.

Defendants argue that their convictions under § 924(c)(1)(A) are due to be reversed because the district court abused its discretion when it responded to the jury's question with language describing a *Pinkerton* theory of liability, especially in light of the fact that the court previously declined to give a *Pinkerton* instruction in its initial charge to the jury. We review a district court's response to a jury question for an abuse of discretion. *United States v. Lopez*, 590 F.3d 1238, 1247 (11th Cir. 2009). It may be appropriate in some circumstances for a district court to expand upon an initial instruction when a jury question arises. *See Bollenbach v. United States*, 326 U.S. 607, 612–13, 66 S. Ct 402, 405 (1946) ("When a jury

makes explicit its difficulties a trial judge should clear them away with concrete accuracy."). But while the district court enjoys "considerable discretion regarding the extent and character of supplemental jury instructions, it does not have discretion to misstate the law or confuse the jury." *Lopez*, 590 F.3d at 1247–48 (citing *United States v. Sanfilippo*, 581 F.2d 1152, 1154 (5th Cir. 1978) (per curiam)). Further, the court may not change the original instruction in a manner that prejudices the defendant. *Lopez*, 590 F.3d at 1252–53. "Such prejudice occurs when the change in the instructions is substantial, when the instructions repudiate counsel's arguments, or when the instructions impair the effectiveness of those arguments." *Id.* at 1253 (quoting *United States v. Descent*, 292 F.3d 703, 707 (11th Cir. 2002) (per curiam)).

In *Lopez*, this Court was confronted with a defendant who was charged with conspiring to encourage or induce an alien to unlawfully enter the United States in violation of 8 U.S.C. § 1324(a)(1)(A)(iv). *Id.* at 1243. During the charge conference, the government asked the district court to provide the jury with dictionary definitions for two terms— "encourage" and "induce"—which were otherwise undefined in the statute. *Id.* at 1246. The defendant objected and the district court declined the requested instruction, instead allowing the parties to argue their positions on the common meanings of the terms during closing arguments. *Id.* However, the jurors subsequently sent a note to the court asking

9

whether certain verbal or nonverbal communication was necessary for the defendant's conduct to be deemed encouragement. *Id.* In response, the district court, over the defendant's objection, provided the dictionary definitions it had previously declined to give. *Id.* at 1247. The jury ultimately returned a verdict finding the defendant guilty. *Id.*

On appeal, the defendant argued that the district court's supplemental instruction violated Federal Rule of Criminal Procedure 30 because the court reversed its earlier decision not to define the statutory terms.[4] *Lopez*, 590 F.3d at 1252–53. This Court rejected the defendant's argument, holding instead that the district court's decision not to initially define the terms did not preclude it from expanding upon its instructions in response to the jury's question. *Id.* at 1253. Moreover, we concluded that there was no prejudice to the defendant because it was clear he would have made an identical argument to the jury regardless of whether the terms were defined in the initial instruction. *Id.* at 1253–54.

This case presents a markedly different situation from *Lopez* as there is prejudice to Mondestin and Aurelhomme resulting from the supplemental instruction. A defendant may be prejudiced by a supplemental instruction when the instruction substantially changes the initial jury charge. *See Descent*, 292 F.3d at

---

[4] Federal Rule of Criminal Procedure 30 requires a district court, when requested, to inform counsel of its proposed action upon requested jury instructions prior to closing arguments. Fed. R. Crim. P. 30.

707 (stating that prejudice may be found "when the change in the instructions is substantial"). The district court's supplemental instruction in *Lopez* did not present such a "substantial" change, but rather, simply clarified the meaning of a term for which the court had previously left undefined. In contrast, here the district court's response provided an entirely new theory under which the jury could find the defendants guilty of the offense charged. Even more, the *Pinkerton* "reasonably foreseeable" test described in the supplemental instruction established a significantly lower standard for culpability than the knowledge-based "aiding and abetting" theory upon which the jury was first instructed.

There are several problems that arise when a court fundamentally changes the jury instruction in response to a question raised during deliberations. For one, it has the potential to confuse the jurors, leaving them uncertain of which standard to apply. Furthermore, such a change in the instruction deprives the defendants of the opportunity to argue their case to the jury, especially with regard to the added theory of liability.

The government contends that there was no prejudice here because the defendants would have argued their case the same way even if they had known the district court intended to give a *Pinkerton* instruction. In support of this argument, the government points to Aurelhomme's trial strategy of arguing his complete innocence of any involvement in the robbery. We cannot accept this reasoning as

11

this Court is not in a position to speculate about what arguments the defendants would or would not have made if they were confronted with a substantially different jury instruction. Criminal defendants regularly appeal to the jury in the form of alternative arguments, and there is no reason to believe the defendants in this case would not have done the same. For example, Aurelhomme could well have maintained his innocence, but also argued in the alternative that even if the jury disbelieves him they should nonetheless find that it was not reasonably foreseeable that the other robber would carry a gun. Indeed, the defendants have made a similar argument in this appeal, contending that there was insufficient evidence at trial to support a § 924(c)(1)(A) conviction based upon a *Pinkerton* theory of liability.

This Court cannot declare with certainty what the defendants would have argued to the jury if they had known the *Pinkerton* charge was going to be provided, nor can we predict how the jury would have responded to such an argument. Nonetheless, the defendants should have been given the opportunity to argue their case with knowledge of which theory the district court was going to include in its instructions to the jury. Because they were not given such an opportunity, the defendants' Count Three convictions must be reversed.[5]

---

[5] We acknowledge the Supreme Court's recent decision in *Alleyne v. United States*, __U.S. __, 133 S. Ct. 2151 (2013), and its potential application to the jury instruction with

12

## III.    CONCLUSION

The defendants' convictions under Count Three for using, carrying, brandishing, or discharging a firearm in relation to a crime of violence in violation of 18 U.S.C. § 924(c)(1)(A) are reversed. The convictions under all other counts are affirmed; however, the defendants' sentences are vacated pending the resolution of Count Three. This matter is remanded to the district court for further proceedings consistent with this opinion.

**AFFIRMED IN PART; REVERSED IN PART; AND REMANDED.**

---

respect to the § 924(c) charge. However, because we reverse Count Three on other grounds, we do not address *Alleyne* in this opinion.

13