2016 UT App 13

## THE UTAH COURT OF APPEALS

STATE OF UTAH,
Appellee,
*v.*
MAX EDWARD DOZAH,
Appellant.

Opinion
No. 20130771-CA
Filed January 22, 2016

Third District Court, Salt Lake Department
The Honorable Robin W. Reese
No. 111900666

Lori J. Seppi, Attorney for Appellant

Sean D. Reyes and Christopher D. Ballard, Attorneys
for Appellee

JUDGE MICHELE M. CHRISTIANSEN authored this Opinion, in
which JUDGE JOHN A. PEARCE concurred.[1] JUDGE J. FREDERIC
VOROS JR. concurred, except as to Part II, in which he concurred
in the result, with opinion.

CHRISTIANSEN, Judge:

¶1     Defendant Max Edward Dozah appeals from his
convictions for aggravated kidnapping and aggravated assault,
arguing that the district court erred by denying his requested
compulsion instruction and in responding to a question from the

---

1. Justice John A. Pearce began his work on this case as a
member of the Utah Court of Appeals. He became a member of
the Utah Supreme Court thereafter and completed his work on
the case sitting by special assignment as authorized by law. *See
generally* Utah R. Jud. Admin. 3-108(3).

jury during deliberation without consulting counsel. We reverse the district court's ruling denying Defendant's motion for a new trial, vacate his convictions, and remand the case for further proceedings consistent with this opinion.

## BACKGROUND

¶2      On appeal from a jury verdict, we view the evidence and all reasonable inferences in the light most favorable to that verdict and recite the facts accordingly. *State v. Clark*, 2014 UT App 56, ¶ 2, 322 P.3d 761. We include conflicting evidence as relevant and necessary to understand the issues on appeal. *See State v. Losee*, 2012 UT App 213, ¶ 2 n.2, 283 P.3d 1055.

¶3      The central witness, Kelly, was both a user and seller of methamphetamine. As of January 2011, he owed $400 to his supplier. To clear the debt, Kelly agreed to go with the supplier's boyfriend, Chris, and another man to conduct a drug transaction at another person's house. When the three arrived at the house, they met a fourth man, David. David knocked Kelly unconscious. When he awoke, Kelly found himself tied to a chair. The trio of assailants assaulted Kelly and threatened him by telling him he "was done" and "wasn't going to make it through the night." At some point, Chris and the unnamed man left. While they were gone, "all sorts of people" "paraded" through the house, including David's sister, who sprayed bleach in Kelly's eyes.

¶4      Defendant then arrived with Chris. Kelly testified that Defendant "said it looks like you pissed the wrong people off." Defendant also repeated that Kelly "was done" and "wasn't going to make it through the night." Defendant did not physically assault Kelly and was not present when others assaulted Kelly.

¶5      Defendant conveyed a message from the drug supplier that Kelly would "have to die or be gone." Chris and Defendant discussed putting Kelly on a bus and asked him where he would

like to go. Kelly responded that he wanted to go to Elko, Nevada. The men then untied Kelly and escorted him to the backseat of the supplier's car. Defendant drove the car, with Chris in the front passenger seat.

¶6    Kelly testified that, during the drive, Defendant told him that he was "going to die for messing with [the supplier]." Defendant said he had a lead pipe and was going to "bust" Kelly's kneecaps and leave him "for dead." After driving up Parley's Canyon and turning off onto a side road, they encountered a road closure due to snow. Defendant yelled at Chris that they had chosen the wrong road; Chris replied, "This is fine . . . just do it." Defendant took Kelly out of the car and yelled that he was going to kill Kelly. Chris held a piece of pipe out of the car window but Defendant never took it. Defendant got back in the car and drove off.[2] Left in a remote location in below-freezing weather, wearing only a t-shirt, pants, and shoes, Kelly managed to walk down to an open road where he was eventually rescued. The responding officer noted that Kelly's face was injured and swollen and that Kelly looked like he had been beaten up. The officer also noted that the temperature was twenty degrees Fahrenheit.

¶7    At trial, Defendant argued that he had not been the instigator of the crimes against Kelly. He testified that the supplier had asked him to go to the house because she "was scared that something was going to happen." When he arrived, he saw that Kelly had been beaten up and was tied to a chair. Defendant admitted that he "should have turned around and walked away" but did not. He testified, "I didn't know what was going to happen. I didn't know if they were going to pull a gun on me. I didn't know if I was the next one in the chair, I didn't know what to do." Defendant further testified that he then "inserted" himself into the discussions regarding what to do

---

2. Kelly thought Defendant might have been scared off by the sound of snowmobiles.

with Kelly because he "didn't want [Kelly] to get beat up any more" and "didn't want to get beat up" himself. Defendant stated that when he first suggested untying Kelly, Chris threatened Defendant with being "the next one in the chair."

¶8      According to Defendant, Kelly stated that if they bought him a bus ticket to Elko, they would never see him again. Defendant volunteered to drive Kelly to the bus station and to buy Kelly's ticket. Chris eventually agreed to this plan, provided he could go along. However, when they started driving, Kelly asked Defendant and Chris to take him to a friend's house instead.[3] Defendant testified that Kelly directed them to the closed road and got out of the car on his own. Defendant stated that he was not worried about Kelly, because Kelly "was close enough to the freeway that he could get home."

¶9      Before trial, Defendant asked that the jury be instructed as to the affirmative defense of compulsion. However, after the defense rested, the district court declined to so instruct the jury because the court did not see a basis for the instruction in the evidence:

> I frankly don't see any evidence, not even . . . twisting it in any imaginable way as you've suggested the jury could that would suggest that [Defendant] was compelled to do anything. The State's witnesses have said he was a willing participant, at least [Kelly] has and [Defendant] said I didn't do anything, I was nothing more than a bystander, in fact more than a bystander, I was a good Samaritan, I was trying to rescue [Kelly] . . . . I can't even see in any way that the jury could say that [Defendant] was a part of this. Yes. He was participating in all of this. Yes.

---

3. Defendant did not testify as to Chris's reaction to this change of plans.

> And when he was told not to untie [Kelly] that somehow could be . . . read as that he was being coerced into participating in the aggravated kidnaping, the aggravated robbery and aggravated assault. I just frankly don't see it. It's just too much of a leap. So I won't give that instruction.

As a result of the district court's ruling on his compulsion instruction request, Defendant did not detail a compulsion defense in his closing argument.

¶10 After the jury began deliberating, it sent a note to the court. The note asked for the definition of aggravated assault and asked whether leaving Kelly on the closed road constituted aggravated assault. The district court did not alert counsel to the jury's question and instead sent a written response back to the jury. The court's response told the jury to look to the jury instructions for a definition of aggravated assault. The response also explained, "The other question, must be decided without my help. It is for the jury to decide." Upon learning of the jury's question and the district court's response after the jury returned a verdict, Defendant's counsel objected and filed a motion for a new trial. After oral argument on that motion, the district court denied Defendant's motion for a new trial.

¶11 The jury convicted Defendant of aggravated kidnapping and aggravated assault. Defendant timely appealed.

ISSUES AND STANDARDS OF REVIEW

¶12 Defendant first contends that the district court erred by refusing to instruct the jury on compulsion. We review a district court's refusal to give a requested jury instruction for correctness. *State v. Kruger*, 2000 UT 60, ¶ 11, 6 P.3d 1116.

¶13 Defendant next contends that the district court erred by giving an incorrect supplemental instruction. Whether a given jury instruction correctly states the law is reviewable under a

correction of error standard, with no particular deference given to the district court's ruling. *State v. Archuleta*, 850 P.2d 1232, 1244 (Utah 1993); *State v. Lee*, 2014 UT App 4, ¶ 7, 318 P.3d 1164.

¶14 Defendant also contends that the district court erred in denying his motion for a new trial, because the district court violated his right to be present, right to due process, and right to the assistance of counsel when the court provided a supplemental instruction to the jury without consulting Defendant's counsel. "We will not reverse a trial court's denial of a motion for a new trial absent a clear abuse of discretion." *State v. Maestas*, 2012 UT 46, ¶ 103, 299 P.3d 892. But we "review the legal standards applied by the trial court in denying such a motion for correctness and review the trial court's factual findings for clear error." *Id.* (citation and internal quotation marks omitted).

## ANALYSIS

### I. Compulsion Instruction

¶15 Defendant contends that he was entitled to have the jury instructed as to compulsion and that the district court therefore erred by refusing to give such an instruction to the jury.

¶16 Compulsion is an affirmative defense. Utah Code Ann. §§ 76-2-302, -308 (LexisNexis 2012). "When a criminal defendant requests a jury instruction regarding a particular affirmative defense, the court is obligated to give the instruction if evidence has been presented—either by the prosecution or by the defendant—that provides any reasonable basis upon which a jury could conclude that the affirmative defense applies to the defendant." *State v. Low*, 2008 UT 58, ¶ 25, 192 P.3d 867. "However, a court need not instruct the jury on the requested affirmative defense where the evidence is so slight as to be incapable of raising a reasonable doubt in the jury's mind as to whether the defendant acted in accordance with that affirmative defense." *State v. Burke*, 2011 UT App 168, ¶ 81, 256 P.3d 1102

(brackets, ellipsis, citation, and internal quotation marks omitted). And "when a defendant presents no evidence relating to an affirmative defense, a court may not instruct the jury on that affirmative defense." *Low*, 2008 UT 58, ¶ 28. Consequently, in order to prove that he was entitled to a compulsion defense instruction, Defendant must demonstrate that some evidence was put before the jury to show that he was compelled to engage in the criminal acts with which he was charged.

¶17 Utah Code section 76-2-302 explains when the defense of compulsion is available:

> (1) A person is not guilty of an offense when he engaged in the proscribed conduct because he was coerced to do so by the use or threatened imminent use of unlawful physical force upon him or a third person, which force or threatened force a person of reasonable firmness in his situation would not have resisted.
>
> (2) The defense of compulsion provided by this section shall be unavailable to a person who intentionally, knowingly, or recklessly places himself in a situation in which it is probable that he will be subjected to duress.

Utah Code Ann. § 76-2-302(1), (2). To assert the affirmative defense of compulsion, "the defendant [must have been] faced with a specific, imminent threat of death or serious bodily injury" to himself or a third person and the defendant must have had "no reasonable legal alternative to violating the law." *State v. Ott*, 763 P.2d 810, 812 (Utah Ct. App. 1988) (citing *State v. Tuttle*, 730 P.2d 630, 634–35 (Utah 1986)).

¶18 Defendant first argues that the specific imminent threat he faced was contained in Chris's statement made to Defendant that Defendant "could be the next one in the chair" if he untied Kelly. The State notes that Defendant's testimony regarding

whether this statement scared him was ambivalent: "I don't know if I was actually afraid. I was—for lack of a better word, weary[4] I guess." Defendant then clarified that he considered Chris's statement "credible." The State also notes that the statement was intended to prevent Defendant from intervening in the assault on Kelly, not to compel him to participate in the crime. We agree with the State. Chris's statement to Defendant threatened him with harm if he performed a specified action— untying Kelly. Chris did not threaten to harm Defendant if he refused to perform criminal acts. Accordingly, it cannot be the basis of an affirmative defense for committing those acts.

¶19  Defendant also claims that he "inserted" himself into the conversation between Chris and David and "intervened" due to the death threats against Kelly. Defendant claims that he was compelled to act as he did because he feared that if he did not do so, Kelly would be killed or more seriously injured. The State responds that none of the threats made against Kelly were contingent on Defendant's failure to participate. However, we read Defendant's argument to apply to the totality of the situation; in other words, that Defendant believed physical harm was going to befall Kelly imminently unless Defendant did something to mitigate or prevent it. Nevertheless, we are unconvinced that a mitigation defense—i.e., that Defendant's assault of Kelly was necessary to forestall the other assailants from killing or battering Kelly—constitutes a compulsion defense. Compulsion, by the terms of the statute, occurs only when the actor "was coerced" to perform the criminal act. *See* Utah Code Ann. § 76-2-302(1); *see also State v. Maama*, 2015 UT App 234, ¶ 15, 359 P.3d 1266 (holding that a robbery defendant was not entitled to a compulsion instruction in the absence of a claim that he or the victim was "the target of a specific threat forcing [the defendant] to participate in the robbery"). We are

---

4. It seems likely that "weary" was a transcriber's error. We suspect that Defendant's testimony was that he was "wary" and treat it accordingly.

unaware of any case holding that the legal doctrine of compulsion applies when the defendant acted not at the behest of a third party but instead affirmatively chose to harm a victim in order to prevent a third party from inflicting some greater harm.[5]

¶20   Defendant has not demonstrated error in the district court's determination that he was not entitled to have the jury instructed as to compulsion, because his theories of the case did not involve compulsion as defined by statute. We therefore conclude that the district court did not err by refusing to instruct the jury as to compulsion.

## II. The District Court's Response to the Jury's Questions

¶21   Defendant next contends that the district court's response to a question from the jury "left the jury with an incorrect understanding of the law that may have misled the jury into convicting based on conduct that did not satisfy the elements of the charged offenses." Defendant also contends that the district court "erred by providing a supplemental instruction without first informing the defense and without [Defendant] or defense counsel present." He argues that the district court "answered the jury's 'substantive' question . . . ex parte" and that doing so amounted to improper contact with the jury. Defendant further argues that the court's response violated his due process right to be present as guaranteed by the Sixth Amendment to the United States Constitution. We address the challenge to the legal substance and the challenge to the procedure of the response together.

¶22   "'[A] defendant is guaranteed the right to be present at any stage of the criminal proceeding that is *critical* to its outcome

---

5. Defendant's theory of the case appears to more closely resemble a defense-of-others or absence-of-criminal-intent argument than a defense of compulsion as defined by Utah Code section 76-2-302.

if his presence would contribute to the fairness of the procedure.'" *State v. Maestas*, 2012 UT 46, ¶ 56, 299 P.3d 892 (quoting *Kentucky v. Stincer*, 482 U.S. 730, 745 (1987)). "But 'this privilege of presence is not guaranteed when presence would be useless, or the benefit but a shadow.'" *Id.* (quoting *Stincer*, 482 U.S. at 745).

¶23    The court's initial instructions told the jury that, to convict Defendant of aggravated assault, it had to find beyond a reasonable doubt:

> 1. That [Defendant], as a party to the offense;
>       a. Intentionally or knowingly, solicited, requested, commanded, or encouraged [Chris] to; **OR** intentionally aided [Chris] to:
>       i(a).    Attempt, with unlawful force or violence, to do bodily injury to [Kelly]; **or**
>       i(b).    Threaten to do bodily injury to [Kelly], accompanied by a show of immediate force or violence; **and**
>       ii.      Use a dangerous weapon; **and**
>
> 2. The [Defendant],
>       a. Intended that [Chris] commit the crime of Aggravated Assault; **or**
>       b. Was aware that his conduct was reasonably certain to result in [Chris] committing the crime of Aggravated Assault.

(Emphases in original.)

¶24    During deliberation, the jury sent a note to the court, seeking clarification of two topics:

> Define => Aggravated Assault?
> Question: If leaving Kelly in the canyon does that =
> "Aggravated Assault"?

The district court, without consulting Defendant's counsel or the State, responded in writing that "[t]he elements for the crime of aggravated assault are given in the instructions. The other question, must be decided without my help. It is for the jury to decide."

¶25   The Utah Rules of Criminal Procedure specify how a district court is to react to notes from the jury. The court may "direct that the jury be brought before the court where, in the presence of the defendant and both counsel, the court shall respond to the inquiry or advise the jury that no further instructions shall be given." Utah R. Crim. P. 17(n). Alternatively, the court "may in its discretion respond to the inquiry in writing without having the jury brought before the court." *Id.* Thus, the court is not required to consult counsel before responding to a jury's note.

¶26   Nevertheless, the court's discretion in responding to a jury's question is not unlimited. The court should not, for example, issue new substantive instructions absent counsel's input. *See id.* (providing that a court must inform and consult counsel before instructing the jury); *see also State v. Thomas*, 777 P.2d 445, 448 (Utah 1989) (holding that a court's response, given without consulting counsel, was not improper, because it "did not instruct as to the law but merely directed and encouraged the jurors to continue deliberations"); *State v. Kessler*, 49 P. 293, 295 (Utah 1897) (holding that it was not error for the court to give a substantive new instruction to the jury after deliberations began where the instruction was given in court, with the defendant and his counsel present). This is especially true when the mid-deliberation supplemental instruction contradicts, or could reasonably be construed to contradict, the initial instructions arrived at in consultation with counsel and given to the jury before deliberation. *See United States v. Mondestin*, 535 F.

App'x 819, 823–24 (11th Cir. 2013) (per curiam) (vacating convictions after noting "several problems that arise when a court fundamentally changes [a] jury instruction in response to a question raised during deliberations"); *State v. Porter*, 705 P.2d 1174, 1177 (Utah 1985) (holding that a supplemental instruction did not amount to reversible error when it merely clarified a point of law on which the jury had already been instructed).

¶27 Defendant claims that the district court's written response constituted a supplemental instruction which erroneously stated the law. He argues that "'leaving Kelly in the canyon' could not, as a matter of law, constitute aggravated assault because it did not involve use of a dangerous weapon or an attempt with unlawful force or violence to do bodily injury or a threat to do bodily injury accompanied by a show of immediate force or violence."[6] The State concedes that abandoning Kelly could not

---

6. Defendant argues that "the scenario did not involve use of a dangerous weapon" because cold weather does not fall within the category of dangerous weapons. But he does not address the evidence of the pipe and pipe-related threats. For example, the jury heard testimony that Defendant and Chris had driven Kelly to a remote and freezing location, that Defendant had taken measures to prevent Kelly from escaping during the drive, that Defendant had threatened to "bust" Kelly's kneecaps and leave him "for dead," that Defendant took Kelly out of the car, and that Chris had held a two- or three-foot metal pipe out to Defendant after telling Defendant to "just do it."

Defendant also argues that the scenario presented to the jury did not involve an attempt or threat to commit bodily injury because "[t]here was no evidence that Chris or [Defendant] attempted or threatened to do bodily injury by leaving Kelly in the canyon. Nor was there any evidence that 15 to 20 degree weather could do bodily injury." But Defendant does not explain whether wintry weather's effect on a jacketless person could be understood by the jury without expert testimony. We note that

(continued…)

legally amount to aggravated assault by itself. However, the State argues that the jury's note asked not whether that act alone was enough but whether it could be sufficient in light of the alleged attendant circumstances and threats.

¶28    It does not appear that the district court intended to respond substantively to the jury's question. Rather, the court sought to refer the jury back to the instructions because the jury's second question "must be decided without my help." However, it is not the court's intention that controls the propriety of a supplemental instruction, but its resulting effect upon the jury. *See Mondestin*, 535 F. App'x at 824 (explaining that a contradictory supplemental instruction is improper because, inter alia, "it has the potential to confuse the jurors, leaving them uncertain of which standard to apply"); *see also United States v. Robinson*, 86 Fed. App'x 820, 823 (6th Cir. 2003) (considering whether a supplemental instruction caused the jury to be confused or misled).

¶29    It is a plausible reading of the note that the jury intended to ask whether leaving Kelly in the canyon was sufficient *on its own* to constitute aggravated assault. If that was indeed the jury's question, the court's response that "[i]t is for the jury to decide" could reasonably have been interpreted by the jury as a supplemental instruction that contradicted the court's initial instruction explaining the elements the jury needed to find before it could convict Defendant of aggravated assault. Such a contradiction could have confused the jurors. *See Mondestin*, 535 F. App'x at 824. Moreover, reading the response in this manner would have resulted in a misstatement of the law.

¶30    When it appears from a jury's question that the jury is headed toward basing its decision on an improper

---

(…continued)
the jury was instructed that "'[b]odily injury' means physical pain, illness or an impairment of physical condition."

understanding of the law, it is incumbent on the district court to correct the jury's understanding of that law via a new and correct instruction, *after* consulting with counsel. *See State v. Couch*, 635 P.2d 89, 94 (Utah 1981) ("Jurors cannot be considered properly instructed on a criminal statute if they are demonstrably confused about the meaning of the words used in it."); *supra* ¶ 26.

¶31    Because it is reasonably possible that the jury interpreted the court's response as a new instruction, despite the court's apparent intent to simply refer the jury back to the earlier instructions (which would normally be prudent), and because the new instruction had the potential to confuse the jury in a way that misstated the law, we conclude that the district court's response amounted to prejudicial error. We therefore vacate Defendant's aggravated assault conviction.

¶32    We next consider whether the effect of the error extended beyond Defendant's conviction for aggravated assault to his conviction for aggravated kidnapping. Instruction 17 informed the jury that one way it could convict Defendant of aggravated kidnapping was if it found that, "[i]n the course of detaining or restraining [Kelly]," Defendant had acted with the intent of facilitating an aggravated assault. Thus, if the jury did in fact convict Defendant of aggravated assault on an improper basis, the jury could have determined that the aggravated assault element of the aggravated kidnapping instruction was satisfied. Such a determination would have been improper due to the infirmity of the aggravated assault conviction. We therefore conclude that the aggravated kidnapping conviction is also infirm.

¶33    The State urges us to "enter a conviction for simple kidnapping . . . because any error in the aggravated assault instruction affected only the element that elevated the kidnapping to an aggravated kidnapping." Utah appellate courts may enter convictions for lesser included offenses after holding that the evidence presented was insufficient to support conviction for the greater offense. *See, e.g., State v. Dunn*, 850 P.2d

1201, 1211 (Utah 1993); *State v. Pullman*, 2013 UT App 168, ¶¶ 17–20, 306 P.3d 827; *State v. Powasnik*, 918 P.2d 146, 150 n.2 (Utah Ct. App. 1996). To do so, the appellate court must determine whether "(i) the trier of fact necessarily found facts sufficient to constitute the lesser offense, and (ii) the error did not affect these findings." *Dunn*, 850 P.2d at 1209.

¶34    A jury may convict a defendant of kidnapping if it finds that the defendant detained or restrained the victim "for any *substantial* period of time" or "in circumstances exposing the victim to risk of bodily injury." *See* Utah Code Ann. § 76-5-301(1) (LexisNexis 2012) (emphasis added). Here, however, the relevant portion of the aggravated kidnapping instruction given to the jury only required it to find that Defendant "[d]etained or restrained [Kelly] against his will." As a result of this instruction, the jury did not have to consider whether the detention or restraint existed for a substantial length of time when it convicted Defendant of aggravated kidnapping.

¶35    Because the jury was not required to consider whether one of the elements of a simple kidnapping conviction had occurred, we cannot conclude that "the trier of fact necessarily found facts sufficient to constitute the lesser offense." *See Dunn*, 850 P.2d at 1209. We therefore cannot enter a conviction for simple kidnapping. *See id.*

¶36    Defendant asks that we enter a conviction for unlawful detention. "An actor commits unlawful detention if the actor intentionally or knowingly, without authority of law, and against the will of the victim, detains or restrains the victim under circumstances not constituting a violation of" the kidnapping, child kidnapping, or aggravated kidnapping statutes. Utah Code Ann. § 76-5-304(1).

¶37    As noted above, we have the ability to enter a conviction for a lesser included offense when we determine that an error occurred but did not affect the jury findings relating to the lesser included offense. *Dunn*, 850 P.2d at 1209. But this power is discretionary and appears only to have been exercised when the

evidence presented to the jury was insufficient to sustain a conviction for the greater offense.[7] Here, the error we have identified did not concern the sufficiency of the evidence presented. Rather, the court's response to a question from the jury could reasonably have been construed as a substantively new and legally incorrect instruction. If the jury had been correctly instructed as to the law, the evidence presented to the jury would have been legally sufficient to sustain Defendant's convictions.[8] Accordingly, we decline to enter a conviction for the lesser included offense of unlawful detention.

¶38    We reverse the district court's denial of Defendant's motion for a new trial, vacate Defendant's convictions for aggravated assault and aggravated kidnapping, and remand for further proceedings consistent with this opinion.

CONCLUSION

¶39    We conclude that the district court correctly determined that Defendant had not presented evidence giving rise to a compulsion defense, and we affirm the district court's refusal to give a compulsion instruction. However, because it is plausible that the jury understood the district court's response to the jury's questions about aggravated assault as a new instruction contradicting the initial instructions, and because such an instruction would have misstated the law, we vacate Defendant's aggravated assault conviction. And because the jury could have based Defendant's aggravated kidnapping

---

7. Where the evidence presented to the jury is legally insufficient to convict the defendant, double jeopardy concerns may bar the State from retrying the defendant for any lesser included charges.14

8. At oral argument, Defendant conceded that he was not arguing that the evidence presented to the jury was insufficient to sustain his convictions.

conviction on the aggravated assault conviction, we vacate the aggravated kidnapping conviction as well. We remand to the district court for further proceedings.[9]

———————

VOROS, Judge (concurring in part and concurring in the result in part):

¶40    I concur in the majority opinion except as to Part II, in which I concur only in the result. In my opinion, the trial court's supplemental instruction violated the principles adopted by our supreme court in *State v. Couch*, 635 P.2d 89 (Utah 1981).

¶41    Directing a jury back to a correct elements instruction is almost always a prudent course. But here, the jury's note suggested the possibility that at least one juror was contemplating voting to convict on a legal theory that all now agree would constitute an error of law. In such a circumstance, merely directing the jury back to the elements instruction is, in my view, insufficient and therefore erroneous. The potential harm of allowing a juror to convict on a demonstrably flawed legal theory so outweighs the burden on court and counsel of giving a brief supplemental instruction that I would require the instruction. That is, as I understand it, the principle informing the supreme court's opinion in *Couch*.

¶42    For reasons explained in the majority opinion, I agree that the error here infected both convictions.

———————

9. Defendant also raises the cumulative error doctrine as an alternative ground for relief. *See, e.g.*, *State v. Davis*, 2013 UT App 228, ¶ 16, 311 P.3d 538 (explaining the application of the cumulative error doctrine). Given our resolution of Defendant's challenges, we need not address this claim.