2019 UT App 172

# THE UTAH COURT OF APPEALS

STATE OF UTAH,
Appellee,
*v.*
TISHA LYNN MORLEY,
Appellant.

Opinion
No. 20170957-CA
Filed October 24, 2019

Second District Court, Ogden Department
The Honorable Scott M. Hadley
No. 141900806

Emily Adams and Cherise M. Bacalski, Attorneys
for Appellant

Sean D. Reyes and Jeffrey S. Gray, Attorneys
for Appellee

JUDGE KATE APPLEBY authored this Opinion, in which
JUDGES MICHELE M. CHRISTIANSEN FORSTER and JILL M. POHLMAN
concurred.

APPLEBY, Judge:

¶1     A jury convicted Tisha Lynn Morley of child abuse homicide and she was sentenced to five years to life in prison. Morley contends she received ineffective assistance of counsel when her attorney failed to object to (1) the testimony of one of the State's expert witnesses and (2) the State's introduction of certain photographs and a video depicting a toddler attempting to pick up a cardiopulmonary resuscitation (CPR) doll. Morley urges us to either direct the district court to enter judgment for the lesser included offense of negligent homicide or remand the case for a new trial. We affirm.

## BACKGROUND[1]

### *Victim's Injury and Death*

¶2 The morning of February 19, 2014, began as any other for one mother (Mother). On her way to work, she dropped off her two sons, a three-year-old (Brother) and an eight-month-old (Victim), at Morley's in-home daycare. Mother recalled Victim "was his normal self, smiling, happy, playful."

¶3 Morley claimed that, later in the morning, she left Victim on a mat on the floor with several three- and four-year-old children, including Brother, while she disinfected toys in another area of the house. The children were left unsupervised, playing with blocks and other games for about twenty minutes. Upon Morley's return, Victim was still on the mat and was crying uncontrollably and seemed tired but would not take a nap. She said Victim remained tired and fussy throughout the day—at times inconsolable—and he had vomited. Despite this, after Mother sent Morley a text message at 3:09 p.m. asking how the boys were doing, Morley responded at 4:19 p.m. they were "ok" and Victim "ha[d] slept a lot." She reported Victim had eaten a little but "absolutely would not take a bottle" and was currently sleeping.

¶4 The boys' father (Father) arrived shortly after 5:00 p.m. to pick up Victim and Brother. Victim had vomited and was limp, unresponsive, and cold to the touch. Morley sprinkled water on

---

1. "On appeal from a jury verdict, we view the evidence and all reasonable inferences in the light most favorable to that verdict and recite the facts accordingly. We include conflicting evidence as relevant and necessary to understand the issues on appeal." *State v. Dozah*, 2016 UT App 13, ¶ 2, 368 P.3d 863 (quotation simplified).

his face in an attempt to awaken him, to no avail. Father took the boys home, where he met Mother, and the family rushed Victim to the emergency room.

¶5     At the hospital, a CAT scan revealed Victim had "a severe skull fracture." He was flown to a children's hospital where, three days later, Mother and Father were told he would never regain consciousness. Mother and Father removed life support and Victim died hours later.

¶6     An autopsy revealed significant bruising behind Victim's right ear, a skull fracture, brain swelling, and bleeding in both eyes. Both of his arms had fractures to the humerus,[2] an injury which the medical examiner testified was "an uncommon site for a fracture" and is "most commonly seen . . . in child abuse." The medical examiner concluded the cause of Victim's death was blunt force injury to the head and classified the death as a homicide. An ocular pathologist analyzed Victim's eyes and found significant retinal hemorrhaging in each of them, which indicated "non-accidental trauma . . . consistent with abusive head trauma."

*The Investigation*

¶7     Based on Victim's injuries, the police were notified about "a child that had received a head injury," and an officer was directed to interview Morley because Victim was injured at her house. When the officer asked Morley where Victim could have hit his head, Morley theorized he could have banged it on the highchair because he had been "rocking his head back and forth" while sitting in it. The officer examined the highchair, which was made of pliable plastic with rounded corners. The

---

2. The humerus is "the long bone of the upper arm." *Humerus*, Webster's Third New International Dictionary (1968).

officer told Morley he was looking for something harder or sharper that could have caused a skull fracture. Instead of responding to the officer, Morley addressed her husband, inquiring whether he knew about a large, crescent-shaped crack on the top of their changing table. Morley wondered if her three-year-old daughter caused the crack because she often climbed onto the table to get into the attached crib.[3] Morley said the crack had "just now" come to her attention and she could not remember whether she changed Victim on it the day he was injured. When the officer inspected the changing table, the crack was covered with a blanket and a support beam was visible through the crack.

¶8    In the following days, investigators interviewed some of the children who were at Morley's house for daycare when Victim was injured. A few weeks later, they were notified that another child (Child), who was not interviewed initially, claimed Brother was the one who hurt Victim. Child told investigators Brother picked up Victim with one hand, threw him down, kicked him, slammed his head in a door, and jumped on him when Morley went downstairs and left Victim unattended with the older children. Child also told investigators Brother drew on Victim's face and Victim was bleeding, but there was no evidence that either of these things occurred. Child also claimed Victim was already dead by the time Morley returned from disinfecting toys.

¶9    In an attempt to corroborate Child's claim, investigators obtained a CPR doll; it was several inches shorter than Victim. They stuffed its chest with weights to make it weigh slightly over 12.5 pounds to get closer to Victim's weight of about 17

---

3. Indeed, several days later, Morley's daughter told investigators she broke the table after climbing onto it to get into the crib.

pounds. Investigators then made a video recording of Brother attempting to pick up the doll; although it was shorter and lighter than Victim, Brother was able to lift only part of it a few inches off the ground. This experiment led investigators to conclude Brother was physically unable to inflict the injuries Victim sustained.

¶10    The State charged Morley with child abuse homicide on the theory that, in a fit of frustration and rage, she grabbed Victim by the arms, shook him, and slammed his head on the changing table. Morley's defense centered on the theory that Brother inflicted the injuries when she left the children unattended. Morley maintained that her daughter caused the crack on the changing table.

*The Trial*

¶11    At trial, the State called five experts to testify: the child abuse pediatrician who had consulted on Victim's case at the children's hospital, the ocular pathologist who examined Victim's eyes, the medical examiner who performed the autopsy, a pediatric neuroradiologist who reviewed Victim's MRI and CAT scans (collectively, Other Experts), and the biomechanical engineer (Engineer) who opined on the force necessary to cause Victim's injuries.

¶12    Engineer ruled out constrained force as the source of Victim's skull fracture, which is when "one side of the head is against another object" and "force is applied opposite that," because there was not "an equal and opposite force on the face." Instead, Engineer said the skull fracture was caused by "an unconstrained impact" and the crack in the table "was caused by a round object connected to something." Engineer testified Victim's humeri were fractured when his upper arms were constrained while his torso was moved; essentially, "you grab the arms and shake." Engineer also said Victim's brain

hematomas were likely caused by "not only shaking, but also an impact. And it doesn't have to be on cement or something really hard." Engineer concluded Victim's injuries were explained by "one event": "an adult grabbed [Victim], shaking him, forcibly causing his head to strike a firm object which is perfectly explained by the fracture in this changing table."

¶13 Morley's trial counsel (Trial Counsel)[4] cross-examined Engineer. He emphasized Engineer's lack of a medical degree and that Engineer never examined the changing table or any doors at Morley's house to see whether they could have been used to cause Victim's injuries until after he had written his report. Trial Counsel also challenged Engineer's assertion that he was aware of all relevant peer-reviewed literature by identifying several studies that may have contradicted Engineer's opinion. Trial Counsel addressed Engineer's testimony during closing argument by attacking his methods and conclusions. He told the jury Engineer "came into court and testified with all the answers despite having . . . never done a child abuse homicide case" or "criminal matter," and he was "[n]ot a medical doctor in any fashion."

¶14 The Other Experts agreed Victim's injuries were consistent with abusive trauma. The child abuse pediatrician said picking up Victim and slamming his head on the changing table was "a very likely cause of his injuries," and he did not believe the injuries could have been caused by a three-year-old child. The pediatric neuroradiologist testified Victim's injuries "were caused by the hands of an adult" and his skull fracture could be from "impact to a flat surface." The medical examiner could not definitively identify who caused Victim's injuries but she found it unlikely a three-year-old child could have caused

---

4. Morley was represented by two attorneys at trial; for ease of reading, we refer to them collectively as Trial Counsel.

them. She further opined that the scenario Child described would not cause the bilateral humerus fractures Victim sustained. The ocular pathologist opined the hemorrhaging in Victim's eyes could be caused only by force "consistent with an unrestrained motor vehicle accident" and it was "doubtful" a three-year-old could have been the cause. His findings indicated Victim suffered "a non-accidental trauma . . . consistent with abusive head trauma."

¶15 In addition to the expert testimony, the State offered photographs of the CPR doll on the changing table as a visual aid to demonstrate how an object such as a child's head could create the large, crescent-shaped crack in the table. The base of the doll's head lined up with the crack. To counter Morley's claim that Brother was the actual source of the injuries, the State also introduced the video of Brother attempting to lift the CPR doll. Trial Counsel did not object to the admission of any of these exhibits (collectively, the CPR Doll Depictions).

¶16 During cross-examination and closing argument, Trial Counsel attacked the State's use of the CPR Doll Depictions:

> And you've seen the photographs. I don't know if anyone noticed—I sure hope so. They put this doll on it to make it line up [with the crack on the changing table]. Perfectly, by the way. . . . [Y]ou'll see the photos as you deliberate. They had to spread the legs out entirely. And we asked on cross-examination whether they took any other photos, any other alignments, and they said no.

Trial Counsel also reminded the jury Brother had been "apprehensive" in the video and he was never instructed to pick up the doll by the arms or while he was standing.

¶17 The district court instructed the jury on child abuse homicide and the lesser included offense of negligent homicide.

After a twelve-day trial, the jury found Morley guilty of child abuse homicide and she was sentenced to prison for five years to life. Morley appeals.

## ISSUE AND STANDARD OF REVIEW

¶18   Morley contends Trial Counsel was ineffective for not objecting to Engineer's testimony and the introduction of the CPR Doll Depictions. "When a claim of ineffective assistance of counsel is raised for the first time on appeal, there is no lower court ruling to review and we must decide whether the defendant was deprived of the effective assistance of counsel as a matter of law." *Layton City v. Carr*, 2014 UT App 227, ¶ 6, 336 P.3d 587 (quotation simplified).

## ANALYSIS

¶19   "The Sixth Amendment to the United States Constitution provides a criminal defendant 'the right . . . to have the Assistance of Counsel for his defence.'" *Menzies v. State*, 2014 UT 40, ¶ 71, 344 P.3d 581 (quoting U.S. Const. amend. VI). The United States Supreme Court has held "the right to counsel is the right to the effective assistance of counsel." *Strickland v. Washington*, 466 U.S. 668, 686 (1984) (quotation simplified). To show ineffective assistance of counsel, an appellant must overcome the "strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance," *id.* at 689, and must show both (1) objectively deficient performance and (2) prejudice. *Id.* at 687–88. Because the appellant must prove both *Strickland* prongs, "it is not necessary for us to address both components of the inquiry if we determine that a defendant has made an insufficient showing on one." *Menzies*, 2014 UT 40, ¶ 78 (quotation simplified). We conclude Morley was not prejudiced by Engineer's testimony and Trial Counsel

was not deficient by not objecting to the admission of the CPR Doll Depictions.

*Engineer's Testimony*

¶20    Morley alleges Trial Counsel was ineffective in failing to object to Engineer's testimony at trial because Engineer was the only expert to "absolutely link[] Ms. Morley with [Victim's] injuries." We conclude Morley suffered no prejudice.[5]

¶21    "In making [the prejudice] determination, an appellate court should consider the totality of the evidence, taking into account such factors as whether the errors affect the entire evidentiary picture or have an isolated effect and how strongly the verdict is supported by the record." *Gregg v. State*, 2012 UT 32, ¶ 21, 279 P.3d 396 (quotation simplified). An appellant "must demonstrate prejudice by showing that there is a reasonable

---

5. Morley also argues Trial Counsel was deficient because he failed to object to Engineer's testimony that "an adult grabbed [Victim], shaking him, forcibly causing his head to strike a firm object" and "the injuries that [Victim] had . . . are best explained by shaking accompanied by a strike." We note Engineer's testimony may have exceeded the scope of his expertise. Utah's appellate courts have not weighed in on the issue of whether the testimony of biomechanical engineers without medical degrees should be confined to the impact certain forces have on the body, not medical causation. But as Morley points out, other courts have done so. *See, e.g., Smelser v. Norfolk S. Ry.*, 105 F.3d 299, 305 (6th Cir. 1997), *abrogated on other grounds by General Elec. Co. v. Joiner*, 522 U.S. 136 (1997); *Gostyla v. Chambers*, 171 A.3d 98, 103 (Conn. App. Ct. 2017); *Norfolk & W. Ry. v. Keeling*, 576 S.E.2d 452, 457 (Va. 2003). But because Morley has not shown she was prejudiced by Engineer's testimony, we do not reach the merits of this deficient performance argument.

probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *State v. Vallejo*, 2019 UT 38, ¶ 39, 449 P.3d 39 (quotation simplified). When an appellant contends her trial counsel should have objected to arguably inadmissible evidence, she must "show a reasonable probability that the verdict would have been different absent the excludable evidence." *State v. Edgar*, 2017 UT App 54, ¶ 13, 397 P.3d 656 (quotation simplified).

¶22 Even without Engineer's testimony Morley cannot show a reasonable probability that the result of this proceeding would have been different. Collectively, testimony of the Other Experts strongly supports the jury's verdict, and Morley has not argued their testimony should have been excluded.

¶23 The medical examiner agreed with Engineer that all of Victim's injuries "happened at about the same time." She was unable to explain exactly how they occurred but ruled out the possibility that Brother, "a 30-pound three-year-old[,] kicked [Victim], picked him up by one hand, dropped him, slammed his head in the door, and stepped on him." She also testified "grabbing [Victim], shaking him, [and] slamming him into that changing table" "potentially could" have caused all of Victim's injuries.

¶24 The child abuse pediatrician opined that "grab[bing] [Victim] by the upper arms, shak[ing] and slam[ming] him down" on the changing table was "a very likely cause of [Victim's] injuries." He also testified it was "extraordinarily unlikely" and "inconceivable"—though not impossible—that a three-year-old could cause "this constellation of findings."

¶25 The ocular pathologist testified that although the hemorrhaging in Victim's eyes could be caused by a door being slammed on his head, the force required would have to be the "equivalent of a motor vehicle accident." He agreed with

Engineer that "an object hitting" Victim "could" cause the injuries, "[w]ith significant enough force."

¶26 The pediatric neuroradiologist was called as the State's rebuttal expert. He testified that the constellation of Victim's injuries "strongly points to abusive trauma or inflicted injury" and said "one traumatic event could explain these findings." He ended by telling the jury the "shaking and shaking impact was . . . likely [the] mechanism to bring all these injuries to an explanation."

¶27 Considering the totality of the evidence in this case, including the extensive testimony from the Other Experts, the admission of Engineer's testimony—even if in error—does not undermine our confidence in the jury's verdict. *See Vallejo*, 2019 UT 38, ¶ 39. The State's evidentiary picture as a whole overwhelmingly supported its theory that Victim's injuries were not caused by a three-year-old child. Rather, Morley, the only person over the age of five with access to Victim during the period he was injured, caused these injuries. Thus, Morley's argument that no other evidence "absolutely links" her to Victim's injuries outside of Engineer's testimony fails.

¶28 In light of the testimony of the Other Experts given at trial, we conclude Morley was not prejudiced by Engineer's testimony.

*The CPR Doll Depictions*

¶29 Morley argues Trial Counsel rendered ineffective assistance by failing to object to the admission of the CPR Doll Depictions. Morley contends these exhibits were irrelevant or, alternatively, substantially more prejudicial than probative.

¶30 An appellate court is "highly deferential" when reviewing trial counsel's performance. *State v. Vallejo*, 2019 UT 38, ¶ 38, 449 P.3d 39. Trial counsel is not deficient when "making tactical

decisions, and courts will not question such decisions unless there is no reasonable basis supporting them." *State v. Garcia*, 2017 UT App 200, ¶ 19, 407 P.3d 1061 (quotation simplified). "To satisfy this test, [the appellant] must overcome the strong presumption that [her] trial counsel rendered adequate assistance by persuading the court that there was no conceivable tactical basis for counsel's acts or omissions." *State v. Nelson*, 2015 UT 62, ¶ 10, 355 P.3d 1031 (quotation simplified). We conclude Morley has not rebutted the strong presumption that her Trial Counsel's decision not to object to the admission of this evidence was a reasonable trial strategy.

¶31    The CPR Doll Depictions were used during the testimony of several witnesses. When Engineer testified, he used the photographs to explain that "the physical dimensions and location of the head in relationship to the fracture and the length and breadth of the changing table [were] consistent with" his opinion. Three officers used the CPR Doll Depictions when they testified, explaining why they decided to add weight to the doll, put it on the table, and see whether Brother could lift it. One of the officers also explained the CPR doll was shorter than Victim but "[i]t was the closest [he] could get to [Victim's] size." Another officer testified that the photographs of the CPR doll on the changing table were taken "[t]o see if it would be consistent with [Victim] having his head slammed into the table."

¶32    Trial Counsel did not object to the introduction of any of the CPR Doll Depictions and instead highlighted to the jury their deficiencies. He cross-examined the officers, asking whether they had tried positioning the CPR doll elsewhere on the table. Additionally, during closing, Trial Counsel pointed out that the video "experiment" with Brother barely took four minutes, Brother seemed distracted the entire time, and the doll's legs kept falling off, which seemed to deter Brother from trying to lift it.

¶33    We conclude this was a reasonable trial strategy. Rather than seek exclusion of the CPR Doll Depictions, Trial Counsel chose to use the exhibits against the State. Trial Counsel emphasized the shortcomings in the CPR Doll Depictions to argue the State was not interested in discovering the truth but instead used unreliable experiments and inaccurate demonstrations to affirm its view of the case. Because Morley has not shown that no reasonable attorney would have used this evidence in the way Trial Counsel did, Morley cannot establish deficient performance.

CONCLUSION

¶34    Morley has not established prejudice resulting from Trial Counsel's failure to object to Engineer's testimony or deficiency in Trial Counsel's failure to object to the introduction of the CPR Doll Depictions. We therefore conclude Morley did not receive ineffective assistance of counsel. Affirmed.

_____