**2020 UT App 25**

# THE UTAH COURT OF APPEALS

STATE OF UTAH,
Appellee,
*v.*
JEREMIAH RAY HART,
Appellant.

Opinion
No. 20180095-CA
Filed February 21, 2020

Third District Court, Salt Lake Department
The Honorable Keith A. Kelly
No. 151905395

Herschel Bullen, Attorney for Appellant

Sean D. Reyes and William M. Hains, Attorneys
for Appellee

JUDGE DAVID N. MORTENSEN authored this Opinion, in which
JUDGES KATE APPLEBY and JILL M. POHLMAN concurred.

MORTENSEN, Judge:

¶1     Jeremiah Ray Hart and Erick Burwell concocted a plot to pose as drug buyers and, instead of closing the transaction, to rob the drug dealers of their inventory. But when they put their plan into action, things went quickly and fatally awry, ending in an exchange of gunshots, the death of one of the sellers (Victim), and the conviction of Hart for several crimes, including aggravated murder. Hart now appeals his convictions with four claims of ineffective assistance of counsel. We affirm.

## BACKGROUND[1]

### *The Attempted Robbery and Murder*

¶2     Hart and Burwell[2] came up with a plan to pose as drug buyers and then to steal drugs from unsuspecting sellers. Through various intermediaries—who thought they were facilitating a standard drug deal—Burwell found Victim and Victim's brother (Brother). Victim and Brother agreed to sell five pounds of marijuana to Burwell and Hart.

¶3     Hart prepared for the heist. He borrowed a 9mm Glock handgun from his cousin (Cousin), who loaded the thirty-one-round extended magazine with a variety of hollow-point and round-nose ammunition from different manufacturers.

¶4     Hart and Burwell put their plan into action. Hart showed the Glock to Burwell and later went to a restaurant to wait for Burwell to pick him up. Burwell first picked up Victim and Brother, with Victim sitting in the front passenger seat and Brother in the seat behind Burwell. They then picked up Hart—the supposed buyer—who sat behind Victim with the Glock concealed. Burwell drove a short distance and turned onto a residential side street to park. As Burwell stopped, Hart pulled out the Glock, pointed it at Brother, and announced, "It's a robbery. It's a jack . . . everybody out of the car." Brother froze, later testifying, "I just put my hands up and just [sat] still."

---

1. "When reviewing a jury verdict, we examine the evidence and all reasonable inferences drawn therefrom in a light most favorable to the verdict, and we recite the facts accordingly. We present conflicting evidence only when necessary to understand issues raised on appeal." *State v. Tulley*, 2018 UT 35, ¶ 4 n.1, 428 P.3d 1005 (cleaned up).

2. Burwell admitted to his role in the events of this case and pled guilty to manslaughter and robbery.

Victim, however, pulled out a gun of his own, and an exchange of shots ensued.

¶5    Hart and Victim were each hit by a bullet and piled out of the car. Burwell drove off, but unbeknownst to him, Brother was still in the car. Burwell feigned surprise and ignorance of the robbery plan and took Brother to Brother's apartment, as requested. Meanwhile, Victim collapsed in the gutter of the street, slowly succumbing to his bullet wound. The bullet had pierced his chest, fatally damaging vital organs, and exited near his spine. Hart fled the scene, leaving behind the extended magazine with the assorted ammunition, a 9mm casing, and a trail of his own blood leading west for about two blocks. He then called Cousin, who picked him up. Later that night, Cousin took Hart to the hospital to have his gunshot wound treated.

*The Investigation*

¶6    Law enforcement officers arrived at the scene to investigate. They found the evidence Hart left behind. The officers also found a Taurus .45 caliber handgun used by Victim and an expended .45 caliber bullet with Hart's DNA on it. Officers interviewed Cousin on three occasions, and Cousin's account of the events changed every time. In his initial interview, Cousin said that he shot Victim but later admitted that he didn't shoot Victim, explaining that he said he did only because he agreed to take the blame for Hart. Cousin also said Hart told him that Hart shot someone. In his second interview, Cousin retracted his claim about Hart saying he shot someone. Then, in his third interview, Cousin admitted that indeed Hart said he shot someone.

¶7    About a month later, officers arrested Hart. At that time, Hart was in possession of a 9mm handgun, which was not a Glock. A forensic firearms examiner (Gun Expert) later test-fired the handgun to determine whether the impression made on the casing would match that of the impression on the casing found at the murder scene. It was not a match. Ultimately, the State charged Hart with aggravated murder, obstruction of justice,

and possession of a dangerous weapon by a restricted person. A preliminary hearing was held. At the hearing, the detective managing the case (Case Manager) testified about Hart's blood-stain patterns—showing that Hart stood above Victim and moved west away from the scene—and about other aspects of the investigation.

## The Rule 404(b) Issue

¶8      Before trial, the State provided notice that it intended to offer other acts evidence under rule 404(b) of the Utah Rules of Evidence. The evidence purported to show that Hart and Burwell planned and attempted to carry out another robbery fifty-four days before the one in which Victim was killed. In the first attempted robbery, the targeted victims fought back. Hart and Burwell fled the scene, and Hart left behind a beanie with his DNA on it. The district court ruled that the evidence was admissible. This court granted an interlocutory appeal on the issue fourteen days before trial. Hart moved to stay the proceedings at the district court pending the outcome of the appeal. But the State agreed not to offer the 404(b) evidence, so the trial could move forward. The appeal was therefore dismissed.

## The Trial

¶9      During a six-day jury trial, the State presented extensive evidence, including a litany of exhibits and numerous witnesses. Hart's defense centered on challenging the adequacy of the State's investigation and undermining the credibility of the State's key witnesses against him, including Cousin and Case Manager. Relevant to this appeal, the following events transpired at trial.

## Gun Expert's Testimony

¶10    The State called Gun Expert to testify. Gun Expert testified that he test-fired and "examined [the Taurus] and another firearm that was submitted as well," concluding that the

impression left on the 9mm casing was from a Glock handgun, not from the Taurus or the other submitted gun. Hart's trial counsel then requested a bench conference wherein counsel pointed out that the other gun was taken from Hart when Hart was arrested. Because that gun had no connection to the shooting of Victim, counsel objected to any reference tying the gun to Hart. The district court and the prosecutor agreed that any such reference would be problematic, but the court noted that the jury had not heard any evidence that "a gun [was] received from [Hart]." To resolve counsel's concern, the court proposed having the prosecutor lead Gun Expert to testify that the other gun was used for comparison purposes only and that it had no connection to this case. Counsel agreed with this approach, and the prosecutor proceeded:

> Q. [W]hen we talk about two guns, one of those guns was a comparison gun just available to you in the lab; is that correct?
>
> A. That's correct.
>
> Q. It is not affiliated with this case?
>
> A. That's correct.

*Cousin's Testimony*

¶11 The State also called Cousin to testify. Cousin testified that he loaded the different types of ammunition into the extended magazine, loaned the Glock to Hart, picked up Hart after the attempted robbery, noticed that the extended magazine was missing from the Glock Hart brought to the car, and heard Hart say he shot someone.

¶12 During cross-examination, Hart's counsel asked about each of Cousin's three interviews with the officers. Cousin tried to justify his shifting accounts by explaining that at first he

tried to take the blame for Hart, but later decided not to, saying, "I was still trying to protect him. . . . [A]t that time they had me in a cell with a person who was taking care of me." Later, as counsel was trying to highlight Cousin's inconsistencies, Cousin volunteered explicit information about Hart's criminal history, including a reference to parole and to being incarcerated.

¶13    Then, Hart's counsel elicited testimony from Cousin that he and Hart shared a jail cell for about a year. Counsel further questioned Cousin about whether he ever read through Hart's legal paperwork associated with this case that was in their cell. Cousin denied looking through Hart's legal papers. He also denied talking to Hart about this case. But he conceded that he had ample opportunity to do both. And he specifically admitted that he had unimpeded access to Hart's legal papers while Hart was working out, taking a shower, visiting the doctor, or attending court. Cousin also admitted on cross-examination that for his willingness to testify he received a "pretty glowing letter" from the State for his upcoming parole review.

¶14    Outside the presence of the jury, counsel went on record stating that his focus on Hart's incarceration was a strategic choice: "[T]his was not some kind of mistake or issue like that, it was a strategic decision the defense has made in consultation with [Hart]." In closing argument, counsel emphasized Cousin's opportunity to talk with Hart about his case and read through his paperwork. Counsel argued that Cousin likely crafted his testimony to coincide with the State's case to improve his chances of parole.

*Case Manager's Testimony*

¶15    The State also called Case Manager to testify, who offered his opinion on the blood at the scene, among other things. He testified that the pattern of blood indicated that Hart initially moved from the east side of Victim, momentarily stood over Victim, and finally fled the scene to the west. On cross-examination, Hart's counsel garnered several concessions.

Case Manager conceded that, even though all the stains weren't tested, there was abundant time to test all of them; that it was a "pretty big assumption" that the eastern-most stain was Hart's blood; and that testing the stain would have foreclosed speculation completely. A defense expert added his testimony that the eastern-most stain would have been the most important one to test. In closing, Hart's counsel argued that the State's investigation was inadequate. Counsel pieced together the blood-stain evidence by discussing the extended magazine, which was farther east than any of the blood stains, arguing, "[T]he reason that they want . . . Hart further this way is because they can't explain how that magazine ends . . . up 15 feet the other way . . . [or] at least 10."

*The Jury's Question*

¶16 A DNA analyst testified that Hart's DNA was on the left sleeve of a jacket. But the analyst did not identify the jacket as Hart's due to her inability to lay foundation for whose jacket she tested. The parties therefore stipulated that the jacket was Hart's, and the stipulation was read into the record. Case Manager later identified the jacket as Hart's and confirmed that it was collected from the hospital Hart visited to treat his gunshot wound. He further explained that Hart's DNA was found on one sleeve of the jacket. Brother also testified that Hart was wearing the jacket the night of the murder.

¶17 After both sides fully presented their cases, the district court directed the jury to deliberate. During its deliberation, the jury sought clarification on the testimony from the analyst regarding the jacket, asking to whom the jacket belonged and whose DNA was on it. The district court responded, "This issue was the subject of a stipulation read into the record by counsel. Please rely on your collective memory of the evidence presented." The jury ultimately found Hart guilty of aggravated murder, obstructing justice, and possession of a dangerous weapon by a restricted person. Hart appeals.

ISSUE AND STANDARD OF REVIEW

¶18    Hart raises four claims of ineffective assistance of counsel.[3] Thus, the sole issue for us to decide is whether Hart's counsel rendered constitutionally ineffective assistance, as a matter of law. *State v. Ott*, 2010 UT 1, ¶ 16, 247 P.3d 344 ("An ineffective assistance of counsel claim raised for the first time on appeal presents a question of law." (cleaned up)).

ANALYSIS

¶19    To prevail on an ineffective assistance of counsel claim, a defendant must establish both that counsel's performance was objectively deficient and that the deficient performance prejudiced the defense. *Strickland v. Washington*, 466 U.S. 668, 687–88 (1984); *State v. Wilder*, 2018 UT 17, ¶ 17, 420 P.3d 1064. "A failure to prove either element defeats the claim." *State v. Ricks*, 2018 UT App 183, ¶ 11, 436 P.3d 350 (cleaned up). Here, we address only the deficient performance element of each of Hart's four claims.

¶20    To prove deficient performance, a "defendant must overcome the strong presumption that his trial counsel rendered

---

3. Hart also contends that the cumulative effect of the claimed errors requires us to reverse. Under the cumulative error doctrine, "we will reverse a jury verdict or sentence only if the cumulative effect of the several errors undermines our confidence that a fair trial was had." *State v. Martinez-Castellanos*, 2018 UT 46, ¶ 39, 428 P.3d 1038 (cleaned up). Because we conclude that Hart's trial counsel did not perform deficiently in any of the ways Hart claims, there is no cumulative error here. *See State v. Maestas*, 2012 UT 46, ¶ 363, 299 P.3d 892 ("If the claims are found on appeal to not constitute error, or the errors are found to be so minor as to result in no harm, the doctrine will not be applied." (cleaned up)).

adequate assistance." *State v. Clark*, 2004 UT 25, ¶ 6, 89 P.3d 162 (cleaned up); *see also Strickland*, 466 U.S. at 689. Counsel's performance is not deficient when there is a conceivable strategic basis for counsel's actions. *Clark*, 2004 UT 25, ¶ 6. Further, counsel's performance is not deficient for declining to make a motion, objection, or request that surely would have failed before the district court. *E.g.*, *Menzies v. State*, 2014 UT 40, ¶ 223, 344 P.3d 581 ("[C]ounsel was not ineffective in failing to challenge the beyond reasonable doubt instruction because the claim would have almost assuredly failed."); *State v. Kelley*, 2000 UT 41, ¶ 26, 1 P.3d 546 ("Failure to raise futile objections does not constitute ineffective assistance of counsel.").

¶21    Here, Hart's first three claims are that his counsel should have requested a mistrial, and his last claim is that his counsel should have objected to certain testimony as not qualifying as expert testimony. Hart's first and third claims fail because his proposed request surely would have been denied by the district court. And his second and fourth claims fail because there was a conceivable strategic basis for counsel's actions. We further explain these conclusions below.

## I. Gun Expert's Testimony

¶22    Hart first contends that his counsel should have moved for a mistrial based on Gun Expert's testimony. Gun Expert testified that he test-fired and examined Victim's gun "and another firearm that was submitted as well" and concluded that the impression left on the 9mm casing was from a Glock handgun, but not from Victim's handgun or the other submitted gun. The other gun was the one found in Hart's possession upon his arrest. Hart posits that "the jury would have been unnecessarily confused and would have believed the firearm was" Hart's and that his counsel was ineffective in failing to request a mistrial when the State introduced evidence of the other gun. We disagree. The facts simply do not support Hart's conclusion.

¶23  A district court "should not grant a mistrial except where the circumstances are such as to reasonably indicate that a fair trial cannot be had and that a mistrial is necessary in order to avoid injustice." *State v. Maestas*, 2012 UT 46, ¶ 325, 299 P.3d 892 (cleaned up). A mistrial is not required where a potentially "improper statement is not intentionally elicited, is made in passing, and is relatively innocuous in light of all the testimony presented." *State v. Allen*, 2005 UT 11, ¶ 40, 108 P.3d 730; *see also State v. Butterfield*, 2001 UT 59, ¶¶ 18, 47, 27 P.3d 1133 (holding that the district court did not abuse its discretion in denying a motion for mistrial after a detective made a vague and fleeting remark that he obtained the defendant's photograph from a jail).

¶24  Here, even if Hart's counsel had moved for a mistrial, the motion surely would have failed because nothing about Gun Expert's testimony made the trial unfair or made "a mistrial . . . necessary in order to avoid injustice." *Maestas*, 2012 UT 46, ¶ 325 (cleaned up). Gun Expert's testimony about the other gun was initially vague and innocuous because it in no way connected the other gun to Hart. Indeed, Gun Expert referred to the other handgun merely as "another firearm that was submitted as well." And after Hart's counsel pointed out in a bench conference that connecting the gun to Hart would be problematic, the prosecutor led Gun Expert to specifically testify that the other gun was used for "comparison purposes only" and that it had no connection to this case. Thus, any possible inference in the jurors' minds up to that point that the gun was connected to Hart was explicitly put to rest. Accordingly, a mistrial motion would have been futile, and Hart's counsel was therefore not deficient in failing to move for a mistrial. *See Kelley*, 2000 UT 41, ¶ 26.

## II. Cousin's Testimony

¶25  Hart also contends that his counsel was ineffective for failing to request a mistrial when Cousin testified that Hart was previously in prison and was further ineffective for emphasizing that fact. "Whether to move for a mistrial . . . is a strategic

decision that is generally left to the professional judgment of counsel." *State v. Padilla*, 2018 UT App 108, ¶ 27, 427 P.3d 542 (cleaned up).

¶26 Here, counsel had a clear strategic reason to acknowledge Hart's incarceration, which was to discredit Cousin's testimony. Counsel illustrated Cousin's potential motive and opportunities to fabricate his testimony: his motive being improvement of his prospects of parole[4] and his opportunities being easy access to Hart's legal papers in their shared cell and innumerable discussions with Hart. Counsel also went to the extent of clarifying, on the record, that this "was a strategic decision the defense . . . made in consultation with [Hart]." Thus, counsel did not perform deficiently because he reasonably used his professional judgment in deciding to use the evidence of Hart's incarceration and not to move for a mistrial. *See id.*; *see also State v. Bedell*, 2014 UT 1, ¶¶ 21, 25, 322 P.3d 697 (holding that the attorney's performance was not deficient for discussing evidence of previous investigations of the defendant's alleged sexual misconduct because counsel's strategic basis was to undermine the accuser's credibility, arguing that she fabricated her story only after she knew of the other accusations against the defendant with "hopes . . . [of] favorable treatment in her own criminal case").

¶27 Additionally, given the pretrial wrangling over the admission of evidence of Hart's previous robbery attempt as a prior act under rule 404(b), reasonable counsel would have recognized that a mistrial would allow the State to seek to offer the evidence thereof, resulting in its potential admission in any subsequent trial. Regardless of the academic merits of the interlocutory appeal, counsel objectively would have been facing a decidedly uphill battle to reverse a discretionary evidentiary

---

4. In fact, Cousin admitted on cross-examination that for his willingness to testify he received a "pretty glowing letter" from the State for his upcoming parole review. *See supra* ¶ 13.

ruling—an uncertain outcome upon which he could not reasonably rely. Put differently, if counsel moved for and received a mistrial, he ran the risk of the 404(b) evidence's admission in a retrial. Not assuming that risk was reasonable under the circumstances, particularly where counsel could use the evidence surrounding Hart's incarceration with Cousin to Hart's benefit. Therefore, counsel did not render deficient assistance, and Hart's ineffective assistance claim fails.

### III. The Jury Question

¶28 Hart additionally contends that his counsel was ineffective for failing to request a mistrial when the jury asked for clarification on the jacket DNA evidence during deliberations. We disagree. Hart does not and cannot show that the jury's confusion, if any after the court's instruction, rose to mistrial levels of unfairness or injustice. *See Maestas*, 2012 UT 46, ¶ 325. That the jacket was Hart's was an insignificant piece of the evidentiary picture supporting Hart's guilt. It is hardly shocking that Hart's jacket had Hart's DNA on it. And neither party referred to the evidence of the jacket in closing argument. Thus, even though the jury sought clarification about the evidence on this issue, a mistrial motion would have been futile. Accordingly, Hart's counsel was not ineffective in failing to move for a mistrial. *See Kelley*, 2000 UT 41, ¶ 26.

### IV. Case Manager's Testimony

¶29 Hart finally contends that his counsel was ineffective for failing to object to a portion of Case Manager's testimony. In particular, Hart asserts that counsel should have objected, under rule 702 of the Utah Rules of Evidence, and argued that Case Manager was not qualified as an expert regarding blood patterns. But just because counsel *can* make an objection does not mean counsel *must* make an objection to avoid rendering ineffective assistance. Legal objections are an inherently strategic business. *See State v. Gonzales*, 2005 UT 72, ¶ 72, 125 P.3d 878 (holding that counsel was not ineffective when she withdrew an

objection and did not renew it because she may have chosen not to "object for strategic reasons . . . such as not drawing attention to th[e] unfortunate information").

¶30   Here, although Hart's counsel could have objected to Case Manager's testimony, counsel was not ineffective for not doing so. He had at least two strategic bases for his decision. First, counsel sought to use Case Manager's testimony to undermine the quality of the State's investigation, as the attorney did in *State v. Bedell*, 2014 UT 1, 322 P.3d 697. Bedell's counsel discussed arguably inadmissible evidence of previous investigations into Bedell's alleged sexual misconduct to undermine the quality and thoroughness of the State's investigation. *Id.* ¶ 21. Our supreme court held that Bedell's ineffective assistance of counsel claim failed "because there was a legitimate strategic decision for . . . Bedell's counsel to use" the evidence of the previous investigations. *Id.* ¶ 25; *see also State v. Morley*, 2019 UT App 172, ¶ 33, 452 P.3d 529 (concluding that counsel acted reasonably in emphasizing shortcomings in the State's investigation rather than seeking exclusion of potentially objectionable evidence). Second, reasonable counsel could have worried that an objection would have provided the State an opportunity to lay foundation in front of the jury that would simultaneously satisfy rule 702 and strengthen Case Manager's testimony in the eyes of the jury. Hart has not pointed us to anything in the record that establishes that Case Manager was not actually qualified to offer the opinion he did. In short, because we conclude that there was a conceivable strategic basis for counsel's decision not to object to Case Manager's testimony, Hart's counsel did not act deficiently in this regard.[5]

---

5. Citing *United States v. Cronic*, 466 U.S. 648 (1984), Hart argues that counsel's performance was so deficient that the trial lost its requisite adversarial testing. But we do not view counsel's performance in this case as so devoid of "meaningful adversarial testing" that "there has been a denial of Sixth Amendment rights

(continued…)

CONCLUSION

¶31 We hold that Hart's trial counsel did not render ineffective assistance because counsel did not perform deficiently in any of the ways Hart claims. We therefore affirm.

—————

(…continued)
that makes the adversary process itself presumptively unreliable." *Id.* at 659. We therefore reject Hart's argument.