2024 UT App 82

## THE UTAH COURT OF APPEALS

STATE OF UTAH,
Appellee,
*v.*
STEVEN TIMOTHY SMITH,
Appellant.

Opinion
No. 20220299-CA
Filed May 31, 2024

Fifth District Court, St. George Department
The Honorable Jeffrey C. Wilcox
No. 211501082

Nicolas D. Turner and K. Andrew Fitzgerald,
Attorneys for Appellant

Sean D. Reyes and Karen A. Klucznik,
Attorneys for Appellee

JUDGE AMY J. OLIVER authored this Opinion, in which
JUDGES DAVID N. MORTENSEN and RYAN M. HARRIS concurred.

OLIVER, Judge:

¶1     After coming home from work, Shawntell Smith (Shawntell) gathered her family as she had planned and calmly told her husband of nearly thirty years, Steven Timothy Smith (Smith), that she was leaving him and taking their kids with her. Over the next twenty-five minutes, Smith left the house, drove to the bank and withdrew $15,000, returned home and put the cash in a drawer, got his gun from the closet and loaded the magazine, and asked his two sons if they agreed with the plan to move out. He then fatally shot Shawntell seven times in the back as she stood in the kitchen. At trial, Smith confessed on the stand, and a jury convicted him of first-degree murder. Smith challenges his conviction on the grounds that the trial court erred in denying his

request for a jury instruction on the defense of extreme emotional distress and in denying his last-minute motion for a continuance to hire an expert witness. We reject both of Smith's arguments and affirm his conviction.

BACKGROUND[1]

¶2 Shawntell and Smith were married and had four children, three of whom were adults in May 2021. The two youngest sons, a fourteen-year-old (Teen Son) and a twenty-year-old (Adult Son), lived at home. Smith "was quick to anger or snap at the kids," threatening them with a belt, cussing at them frequently, and sometimes throwing things at them. Smith also directed his temper, which he believes "every male has," at his wife, Shawntell. As Adult Son testified, Smith once got so angry when Adult Son wanted Shawntell's—not Smith's—help with homework that Shawntell said she would call the police if Smith did not calm down. Smith then "got into her face" and said, "I'm going to put a bullet in your head." Shawntell rarely stood up for herself, was often sleep-deprived from working two jobs— including a graveyard shift—to pay the bills, and had stopped inviting her friends into her house.

¶3 Shawntell eventually decided to leave Smith. For months, she quietly put a plan into action: she confided in her close friends and neighbors, asking for their help storing some of her things; she slowly began packing up boxes; and she found a townhouse and arranged for Adult Son to sign the lease on it. Shawntell decided she would hold a family meeting on May 21, 2021, to tell Smith she was leaving him that same day; she arranged for a couple of friends and neighbors to come help her move after the

---

1. "On appeal, we review the record facts in a light most favorable to the jury's verdict and recite the facts accordingly." *State v. Samples*, 2022 UT App 125, n.3, 521 P.3d 526 (cleaned up), *cert. denied*, 525 P.3d 1279 (Utah 2023).

meeting. One neighbor (Neighbor) was worried about Shawntell's safety if she left the same day she told Smith and suggested, instead, giving Smith "time to process" the news before moving out. But, Shawntell insisted on sticking with her plan out of fear Smith would "retaliat[e]" if she stayed. Neighbor remained "concerned enough" for Shawntell's safety that he "put a gun in [his] truck."

¶4     On May 21, just after 5:00 p.m., Shawntell and three of the kids—Adult Son, a twenty-five-year-old daughter (Daughter), and Teen Son—went into the home office where Smith was on his computer. Shawntell calmly told Smith she was leaving that day and that Adult Son and Teen Son were leaving with her. Smith simply said, "Okay," and asked where they were going, along with who would pay rent on the family house. Shawntell replied that rent "would be his responsibility." Smith calmly turned off his computer, walked to the master bedroom, and looked in the closet for his keys despite always keeping them on the dresser. Shawntell followed him and asked if she could help him find anything. Smith asked if Teen Son had known of her plan to leave, and Shawntell replied that only the older children had known beforehand.

¶5     Despite being "distraught" at the news his wife was leaving and he "was the last one to know," Smith did not reach for any of the guns he kept in a chest on one of the bedroom dressers. Instead, he got his car keys and walked out of the bedroom, leaving the house at about 5:30 p.m. in a "calm" mood. Smith decided to take Shawntell's car rather than the Suburban that was packed up, inferring she was taking the Suburban. He drove down the street to the bank and asked for a specific employee to help him withdraw $15,000 in cash. Smith opted to wait for that employee, who was busy with another customer. The employee suggested that a cashier's check would be safer than carrying around so much cash. Smith refused and told the

employee he was not concerned about safety because he was a retired police officer.

¶6      Smith drove home, arriving at approximately 5:45 p.m. A box truck that Adult Son had brought to help move was taking up most of the driveway, so Smith changed his mind about parking there, reversed the car, and found another parking spot. Neighbor observed Smith driving "at kind of a high rate of speed that just led [him] to believe that [Smith] was agitated." Neighbor tried "to defuse the situation in some manner" by saying hello. Smith replied, "Get the fuck off my property" and Adult Son, who overheard Smith, said to Neighbor, "My dad's true colors shining through."

¶7      Smith walked into the house and went straight to the master bedroom, where he put the cash in a dresser drawer. Smith then saw a friend of Shawntell's packing up her things from the closet and "forcefully" told her to leave. According to Smith, he "wanted to shoot" himself at that point, so he took out a .45 caliber pistol from the gun chest on his dresser and ammunition from the closet, and he went to the bathroom and sat on the toilet to load the gun. Smith claimed he felt "foggy" and "extremely out of it," so when he tried to load the magazine, he did it the wrong way. He realized his mistake and then properly filled the magazine with seven bullets.

¶8      Deciding to kill himself in the backyard, Smith first went to find his sons, intending to ask them "if they wanted [him] around." What he ended up asking, though, was whether they were okay with Shawntell's plan to leave and take them. When they said they were, Smith said it felt like a slap in the face.

¶9      At approximately 5:52 p.m., Smith walked down the hallway to the back door and saw Shawntell with her back to him, her attention focused on doing something in a kitchen drawer. Smith thought to himself, "Okay. It's her fault." Lifting his gun, Smith aimed it at Shawntell and pulled the trigger seven times,

hitting her each time. According to the medical examiner, the bullets penetrated Shawntell's lungs, heart, kidney, bowel, and wrist. Smith watched Shawntell fall, face down, on the kitchen floor. He then went and sat on the couch, placing the gun on the nearby hutch.

¶10 Hearing gunshots from the driveway, Adult Son cried out and ran into the house, where he and Daughter found their mother lying on her stomach. Neither of them saw Smith near their mother, but Adult Son noticed Smith going into the master bedroom and followed, physically attacking him and asking, "Why? Why would you do this?" Smith responded, "I have nothing left." Meanwhile, Daughter called 911 and attempted CPR.

¶11 When the police arrived, Teen Son ran out of the house, and the officers directed him to stay near them as another officer (Officer) "took a tactical position in front of the house." The other two children came out, looking "frantic." Adult Son exclaimed, "I beat the fuck out of my dad. He shot her. The gun is empty. And he's sitting on the couch." Officer ordered Smith to exit the house with his hands up. Smith calmly complied and was arrested. The police asked where the gun was, and Smith told them it was inside. Upon entering the house, the officers found Shawntell's dead body surrounded by blood and seven .45 mm shell casings. After searching for "a long time," the officers found the gun Smith used in the master closet, under a bloody American flag and "tucked" by the wall.

¶12 Smith was taken to the police station, where he received medical treatment for injuries caused by Adult Son. At the beginning of his first police interview, Smith was "pretty calm" but had "periods where he would become emotional." Smith claimed to have memory gaps in the events leading up to the murder, so the police interviewed him a second time to ascertain whether he "recalled or was able to recall anything." During the

second interview, Smith claimed he did not remember shooting Shawntell, but he also "never denied that he shot her" and made statements such as, "I don't deny that I'm not innocent" and, "I probably shot my wife."

¶13    A few days later, the State charged Smith with murder. He pleaded not guilty. Out of an abundance of caution, Smith's appointed counsel (Trial Counsel) requested a competency evaluation. The court granted the request, and Smith was later found competent to proceed. In mid-October, the parties agreed they would be ready for trial if it were set for the following month. On October 29, the State moved to preclude a jury instruction on an extreme emotional distress (EED) defense, contending the evidence would not support the defense under the new governing statute, which requires (among other things) evidence that the defendant had an "overwhelming reaction of anger, shock, or grief" to a "highly provoking act" by the victim, which reaction both (a) "cause[d] the defendant to be incapable of reflection and restraint" and (b) "would cause an objectively reasonable person to be incapable of reflection and restraint." Utah Code § 76-5-205.5(1)(a)(i).[2] The court heard argument and deferred ruling until trial.

¶14    Two business days before trial, Smith filed a "two-page motion" requesting the appointment of an expert witness for an EED defense, a continuance, and funding for the expert. At oral argument on the motion, Trial Counsel argued an expert was needed to help the jury "recognize shock, anger, or grief, and how those things could be manifest." Regarding the lateness of the filing, Trial Counsel argued that a continuance was "a reasonable

---

2. In 2019, the legislature overhauled Utah Code section 76-5-205.5, which governs how a defendant may seek mitigation of a criminal homicide offense for "mental illness or provocation," including "extreme emotional distress." *Compare* Utah Code § 76-5-205.5 (2018), *with id.* (2019).

accommodation" for "a complex issue" and "[t]here are other cases that are set to go if this one has to be continued." In response, the State asserted "the statute is written in such a way that it doesn't require expert testimony." The trial court agreed and denied the motion, concluding that although expert testimony may explain the subjective part of the statute that looks to whether a defendant is "incapable of reflection and restraint," *see* Utah Code § 76-5-205.5(1)(a)(i)(A) (2019), an expert is unnecessary to explain how an "objectively reasonable person" would react to a common occurrence like divorce, *see id.* § 76-5-205.5(1)(a)(i)(B). The trial court reasoned, "People get divorced all the time. And it is very rare that when someone is told, nothing more, 'I'm leaving you,' that that becomes so shocking and overwhelming[] that the person . . . leaving gets killed."

¶15 At the three-day trial, two adult children, neighbors, friends, officers, and the medical examiner testified as recounted above. Smith testified in his defense, confessing on the stand that as he walked to the backyard, "I saw Shawntell right there. And that's when I shot her." At the close of evidence, the trial court heard argument outside the presence of the jury on the State's motion to exclude the EED jury instruction. The court, finding that Shawntell did not engage in any type of highly provoking act before Smith killed her, ruled that the instruction would not be allowed because the evidence did not meet "the statutory requirement of a highly provocative act of the victim." In closing, Trial Counsel argued, "[Smith] did not mean to shoot his wife. That was not his intent." In response, the State pointed out there was plenty of evidence to support Smith's intent to shoot and kill Shawntell, including his own statement that he shot her, the fact he never claimed it was a mistake, and the way he pulled the trigger seven times and did not miss a single time, all indicating Smith "clearly intended to kill her."

¶16 The jury convicted Smith of murder, and the trial court sentenced Smith to fifteen years to life in prison. The court gave

Smith credit for time served but then "recommend[ed] to the Board of Pardons [and Parole] that [Smith] remain in jail for the rest of [his] natural life."

ISSUES AND STANDARDS OF REVIEW

¶17    Smith argues the trial court erred in granting the State's motion to exclude the EED jury instruction. The parties cite differing standards of review for this issue. The State asserts that we should review the decision to give a jury instruction for abuse of discretion, *see State v. Karren*, 2018 UT App 226, ¶ 18, 438 P.3d 18, while Smith states that we should review the decision for correctness, *see State v. Kruger*, 2000 UT 60, ¶ 11, 6 P.3d 1116.[3]

---

3. This dispute may stem from a shift our supreme court made in *Miller v. Utah Department of Transportation*, 2012 UT 54, 285 P.3d 1208. There, the court held that "the refusal to give a jury instruction is reviewed for abuse of discretion, although in some circumstances that discretion will be narrowly constrained." *Id.* ¶ 13. The court went on to clarify that "in certain circumstances a district court's discretion will be constrained such that a party is legally entitled to have a particular instruction given to the jury. In those circumstances, refusal constitutes an error of law, and an error of law always constitutes an abuse of discretion." *Id.* ¶ 13 n.1. The court concluded by holding that "[t]o the extent earlier cases conflict with this opinion in their enunciation of the standard of review for refusal to give a jury instruction, this opinion controls." *Id.*

But despite this clarification, there remains confusion as to when the trial court's "discretion will be narrowly constrained" such that the refusal to give a jury instruction "constitutes an error of law," *Id.* ¶ 13 & n.1. *See, e.g., State v. Rivera*, 2019 UT App 27, ¶ 14, 440 P.3d 694 (reviewing "a trial court's refusal to give a requested jury instruction for correctness" with no mention of the

(continued…)

Ultimately, however, we need not resolve the question of which standard applies because, even under the more stringent correctness standard, we affirm the trial court's decision denying Smith a jury instruction on EED.

¶18 Smith also argues the trial court erred by denying his motion seeking a continuance to obtain an expert witness on an EED defense. "We will not reverse the trial court's decision to grant or deny a continuance absent a clear abuse of discretion." *State v. Alonzo Peraza*, 2020 UT 48, ¶ 58, 469 P.3d 1023 (cleaned up).

ANALYSIS

I. EED Jury Instruction

¶19 Smith asserts the trial court erred when it declined to give an EED jury instruction that could have reduced his murder charge to manslaughter. *See* Utah Code § 76-5-205.5(2)(a)–(b), (5) (2019). Specifically, Smith claims the court "substituted itself as the trier of fact" when it failed to consider Smith's "background or experience" and concluded that no special mitigation existed because Shawntell committed no "highly provoking act," *id.* § 76-5-205.5(2)(b).

---

abuse of discretion standard set forth in *Miller* (cleaned up)); *State v. Dozah*, 2016 UT App 13, ¶ 12, 368 P.3d 863 (same); *State v. Karren*, 2018 UT App 226, ¶¶ 18, 24, 438 P.3d 18 (identifying the standard of review for refusal to give a jury instruction as abuse of discretion, but concluding that "the district court did not err" in denying to give the requested jury instruction). Thus, "we flag the issue for consideration in a future case, noting the apparent lack of clarity in Utah law as to the appropriate standard of review" for the refusal to give a requested jury instruction. *Amundsen v. University of Utah*, 2019 UT 49, ¶ 19 n.5, 448 P.3d 1224.

¶20 "When requested by a criminal defendant, a trial court must give an instruction regarding a particular affirmative defense if evidence has been presented . . . that provides any reasonable basis upon which a jury could conclude that the affirmative defense applies to the defendant." *State v. Rivera*, 2019 UT App 27, ¶ 19, 440 P.3d 694 (cleaned up). However, "a court need not instruct the jury on the requested affirmative defense where the evidence is so slight as to be incapable of raising a reasonable doubt in the jury's mind as to whether the defendant" killed the victim while under the influence of EED. *State v. Burke*, 2011 UT App 168, ¶ 81, 256 P.3d 1102 (cleaned up).

¶21 Under Utah law, EED is defined as "an overwhelming reaction of anger, shock, or grief that . . . causes the defendant to be incapable of reflection and restraint" and "would cause an objectively reasonable person to be incapable of reflection and restraint." Utah Code § 76-5-205.5(1)(a)(i). As relevant here, the defense applies only when the defendant acted "under the influence of extreme emotional distress that is predominantly caused by the victim's highly provoking act immediately preceding the defendant's actions." *Id.* § 76-5-205.5(2)(b).

¶22 Here, the trial court correctly declined to give a jury instruction on the EED defense because the facts do not constitute a "highly provoking act." As the trial court noted, "People get divorced all the time. And it is very rare that when someone is told, nothing more, 'I'm leaving you,' that that becomes so shocking and overwhelming[] that the person . . . leaving gets killed." Shawntell's announcement was a common one—relationships routinely end and people move out—and she made her announcement in a composed and rational way that she had thoughtfully planned out, calmly telling Smith she was leaving during a family meeting in his home office. Under these circumstances, the trial court correctly concluded that Shawntell's actions were not "highly provoking."

¶23  But even if we were to somehow construe Shawntell's civilized, calm disclosure to Smith that she was leaving as a "highly provoking act," it would still not satisfy the statute because it did not occur "immediately preceding" her murder. Approximately twenty-five minutes elapsed between the time Shawntell told Smith she was leaving and when he fatally shot her in the back seven times. Smith argues that the highly provoking act was more like a compilation of acts that was "ongoing from the time Shawntell informed him, and through her efforts to immediately remove everything from the home utilizing the aid of many friends and neighbors." According to the relevant language of the statute, however, a defendant's EED must be "predominantly caused by the *victim's* highly provoking act *immediately preceding* the defendant's actions." *Id.* (emphasis added). Smith didn't shoot Shawntell immediately after she told him she was leaving. He shot her twenty-five minutes later when she was in the kitchen doing something in a drawer with her back turned. Shawntell standing in her kitchen facing away from Smith was the antithesis of "highly provoking."

¶24  Thus, the evidence at trial was "incapable of raising a reasonable doubt in the jury's mind as to whether [the] defendant killed the victim while under the influence of" EED. *State v. Piansiaksone*, 954 P.2d 861, 872 (Utah 1998) (cleaned up). We therefore conclude the trial court correctly declined to give the jury instruction on the EED defense.

## II. Continuance to Obtain an Expert Witness

¶25  Smith also contends that the trial court should have granted his motion for a continuance to obtain an expert witness because the shock or grief required by the EED statute "may require expert explanation to the jury about the various ways in which such emotions or psychological issues can manifest themselves." The State, however, contends the trial court did not

abuse its discretion because Smith failed to meet his burden for such a motion to be granted.

¶26    Because Smith moved "for a continuance to procure the testimony of an absent witness," he must show (1) "that the testimony sought is material and admissible"; (2) "that the witness could actually be produced"; (3) "that the witness could be produced within a reasonable time"; and (4) "that due diligence has been exercised before the request for a continuance." *Mackin v. State*, 2016 UT 47, ¶ 33, 387 P.3d 986 (cleaned up). "A failure to establish even one aspect of the above test defeats [a defendant's] claim." *Id.* Here, Smith falls well short of establishing the required elements.

¶27    First, Smith must show that an expert witness was material to his defense, which required him to "demonstrate with a reasonable probability that the nonadmitted evidence would affect the outcome of the criminal proceeding." *Id*. ¶ 34 (cleaned up). But because Smith was not entitled to the EED jury instruction, *see supra* Part I, any testimony from an expert witness on the elements of the EED defense would have been irrelevant.[4] Thus, any such expert testimony was not material and Smith cannot demonstrate that there is "a reasonable likelihood of a more favorable result" at trial had the motion been granted. *Id*. ¶ 37 (cleaned up).

¶28    Next, the cursory motion was lacking any of the required specifics. It failed to identify any expert by name, the substance of

---

4. Additionally, testimony about whether Smith was "incapable of reflection and restraint," *see* Utah Code § 76-5-205.5(1)(a)(i)(A), may have been inadmissible under rule 704(b) of the Utah Rules of Evidence, which prohibits an expert witness in a criminal case from giving "an opinion about whether the defendant did or did not have a mental state or condition that constitutes an element of the crime charged or of a defense."

the expert's testimony, how quickly the expert could be retained and prepared to testify, and that the unnamed expert would actually be able to appear at trial. *Id*. ¶ 33.

¶29 Finally, Smith failed to demonstrate that he acted with due diligence. He filed his expert witness motion requesting the continuance on the eve of trial, after the State had raised the issue the previous month in its motion to exclude the EED jury instruction.

¶30 In the face of such deficiencies in Smith's expert witness motion, the trial court acted well within its discretion in denying the motion. *Id.* ("A failure to establish even one aspect of the above test defeats [the defendant's] claim.").

CONCLUSION

¶31 Shawntell's calm announcement to Smith that she was leaving and taking the kids with her did not constitute the "highly provoking act" required for an EED defense and, in any event, it did not occur "immediately preceding" Smith's fatal shooting of her. Therefore, the trial court did not err when it declined to instruct the jury on the EED defense. The court likewise did not abuse its discretion when it denied Smith's last-minute motion for an expert witness to assist in presenting that defense. Accordingly, we affirm Smith's conviction.

————————