*This opinion is subject to revision before final publication in the Pacific Reporter*

**2025 UT 54**

IN THE

# SUPREME COURT OF THE STATE OF UTAH

STATE OF UTAH,
*Appellee,*

*v.*

JONATHAN HUNT,
*Appellant.*

No. 20240092
Heard May 7, 2025
Filed November 13, 2025

On Direct Appeal

Third District Court, Salt Lake County
The Honorable William K. Kendall
No. 181403657

Attorneys:
Derek E. Brown, Att'y Gen., Connor Nelson, Asst. Solic. Gen.,
Salt Lake City, for appellee

Nathalie S. Skibine, Salt Lake City, for appellant

JUSTICE PETERSEN authored the opinion of the Court, in which
CHIEF JUSTICE DURRANT, ASSOCIATE CHIEF JUSTICE PEARCE,
JUSTICE HAGEN, and JUSTICE POHLMAN joined.

JUSTICE PETERSEN, opinion of the Court:

## INTRODUCTION

¶1 A jury convicted Jonathan Hunt of murder. At trial, Hunt admitted to the shooting, but claimed that he acted in self-defense. Hunt testified that when he fired, he believed the man he shot was reaching for a weapon. But in reality, the man was unarmed.

¶2 The district court instructed the jury on both perfect and imperfect self-defense. Additionally, Hunt asked the court to give

another instruction specifically advising the jury that actual danger is not an element of self-defense; apparent danger is enough. The trial court declined to do so, concluding that this concept was already covered by the other self-defense instructions. But the court assured Hunt's counsel that he was free to make this argument in closing. Counsel did so, but the jury still convicted Hunt of murder. Hunt now appeals the trial court's refusal to include his proposed jury instruction.

¶3    Hunt also raises two claims of ineffective assistance of counsel. First, he argues that his counsel should have objected when some witnesses used the word "victim" during their testimony to refer to the man Hunt shot. Second, Hunt argues that his counsel should have objected when the State played portions of a 911 call that he asserts were unduly prejudicial.

¶4    We conclude that the court did not abuse its discretion in deciding not to give Hunt's proposed jury instruction, and Hunt did not receive ineffective assistance from his counsel. Accordingly, we affirm.

## BACKGROUND[1]

¶5    Shortly after entering a Rancherito's Mexican Food restaurant in West Valley, defendant Jonathan Hunt shot a man, who we will refer to as N.L.[2] N.L. was unarmed and died from the two gunshot wounds he sustained.

¶6    The events leading to the shooting began about four months prior, when Hunt's friend Jackson* had a falling out with N.L. Jackson's girlfriend at the time had confided in N.L., telling him that she was unhappy in her relationship with Jackson. When N.L. tried to relay this message to Jackson, he did not take it well. Jackson thought N.L. was trying to interfere in his relationship and

---

[1] "When reviewing a jury verdict, we examine the evidence and all reasonable inferences in a light most favorable to the verdict, reciting the facts accordingly. We present conflicting evidence only when necessary to understand issues raised on appeal." *State v. Heaps*, 2000 UT 5, ¶ 2, 999 P.2d 565 (cleaned up).

[2] Consistent with the prosecution's filings, we refer to the victim by his initials to protect his privacy. All other names marked with an asterisk are pseudonyms used to preserve the privacy of witnesses and other individuals.

Jackson "cut him off" completely. The two did not speak again until the day of the shooting.

¶7    On that day, Jackson went to a coffee shop with Hunt and Hunt's girlfriend, Anne.* When they arrived, N.L. was there. Jackson was "astonished to see him," still hurt from the way things had ended between them. Given their history, Jackson, Hunt, and Anne "left almost immediately."

¶8    After leaving the coffee shop, Jackson messaged N.L. on Snapchat and said, "You got me fucked up. Don't ever look at me or try to talk to [my ex-girlfriend] ever again. If you ever see me again, do not approach me or try to make eye contact with me again." N.L. replied, "[Jackson], you need to calm down, honestly. I'm sorry I tried to help. I only ever wanted to help." Jackson responded, "Laugh my ducking fucking ass off. You're lucky I didn't come smash on you when you did this shit. I'm not mad about what happened between us. You stepped out of line. You fucked that shit up. That's what you have the answer for."

¶9    Later that night, Jackson looked up N.L.'s location on Snapchat. N.L. was at Rancherito's. Jackson, Hunt, and Anne drove there together. Hunt got out of the car first to see if N.L. was inside. After confirming he was, Hunt signaled to Jackson to join him outside the Rancherito's. Anne stayed in the car.

¶10   According to Hunt, at this point Jackson turned around, "lift[ed] up his shirt and pull[ed] out a gun," handing it to him. Hunt described it "like a complete hot potato moment," saying that Jackson just "tossed" the gun into his hands. Hunt claimed that he then hid the gun under his shirt, went inside the Rancherito's, and walked straight to the bathroom. Inside, Hunt tucked the gun into his waistband, tightened his belt, and covered the gun with his shirt.

¶11   Jackson denied this account. According to Jackson, not only did he not give the gun to Hunt that night, but he had never seen the gun before Hunt used it to shoot N.L.

¶12   When Hunt left the bathroom, he saw Jackson already seated at a table with N.L. and N.L.'s friend, Brian.* Hunt approached the table and sensed that tensions were high between Jackson and N.L. Brian testified that Jackson was "super aggressive" and that he started "yelling at [N.L.] about some bullshit." From this point forward, Hunt's account of what happened differs from the other witnesses'.

¶13 According to Jackson, Hunt joined the argument and punched N.L.'s head from behind. N.L. then turned in his seat and began to rise. Brian testified that N.L. appeared surprised and said, "You hit me for no reason." He stated that N.L. seemed to take a defensive stance, with his feet "square[d] up" and his fists raised, "prepared to duke it out and fight like a man." But before N.L. could fully stand, Hunt shot him twice. Corroborating this account, a bystander testified that Hunt drew his gun as N.L. was standing and that N.L. "never made it to a standing position before" Hunt fired.

¶14 Hunt tells the story differently, claiming, "I shot [N.L.] to defend my life. I did not murder him." According to Hunt, while he was standing at the table, N.L. looked at him and asked him "what the fuck [he] was looking at and told [him] to mind [his] own business." Hunt claims he then heard N.L. say, "You're dead, bitches." At this point, Hunt says that N.L. "shot up" out of his seat and "reached for a gun." Hunt admitted that he never saw a weapon. But he testified at trial that, "In that moment, sir, I knew he had a gun."

¶15 No gun was found in N.L.'s possession.

¶16 When asked whether he shot N.L. twice, Hunt responded, "I now know that he had two bullet wounds. But at the moment, I was only aware of pulling the trigger once. But I did know I shot him because of how he fell." Jackson, too, described N.L. falling to the floor after being shot "like someone cut the strings of a puppet, straight down." Jackson and Hunt then ran out of the restaurant, back to the car, and drove away.

¶17 Still inside the restaurant, Brian began applying pressure to N.L.'s wounds and called 911 to report the shooting. The 911 operator walked Brian through the steps of performing CPR until emergency medical services personnel arrived. But despite these lifesaving efforts, N.L. succumbed to his injuries and was later pronounced dead at the hospital. Meanwhile, Hunt, Jackson, and Anne drove back to Jackson's apartment.

¶18 Hunt was arrested the following morning. The State charged Hunt with murder and felony discharge of a firearm with serious bodily injury, both first degree felonies.

*Trial*

¶19 Hunt's case proceeded to trial, and he testified in his own defense. Hunt admitted to shooting N.L, but argued that he had

acted in self-defense. Hunt's version of events relied primarily on his own testimony and his stated belief that N.L. was armed and reaching for a weapon. The State contested this narrative. We focus on the portions of the trial that are relevant to this appeal.

*Use of the Term "Victim"*

¶20  During the State's case in chief, five witnesses used the word "victim" to refer to N.L. at some point in their testimony. And Hunt's counsel did not object.

¶21  Three of the witnesses to the incident referred to N.L. as the "victim" at times. Jackson used the word "victim" twice: once to identify N.L. as the person he saw in the coffee shop that day, and again when he explained that after Hunt punched N.L. in the head, "the victim turned and got out of his chair." Brian used the term once in cross-examination to refer to N.L. and twice when recalling and reading aloud a report of statements he had made to a detective on the night of the shooting. And a Rancherito's employee used the word "victim" four times to identify N.L. generally, noting that he saw "the victim and his buddy sitting" in the restaurant, that he saw two men "walk[] over to the victim's direction," again that he saw "two guys . . . walk[] over to the victim," and that he looked to "where the victim was sitting. And [] noticed that he was on the floor already." The employee also used the word twice when explaining that police officers asked over the phone to see "if the victim was still breathing."

¶22  And two of the responding officers also used the term during their testimony. A police officer who arrived at the scene before N.L. was taken to the hospital recounted that he had seen "the victim" lying on the ground unresponsive. And another officer who arrived later used "victim" twice: to identify the person who had been taken to the hospital, and to identify the person to whom another officer had rendered first aid.

¶23  In total, N.L. was referred to as the "victim" fourteen times by witnesses, without objection from the defense.

*911 Recording*

¶24  During the State's direct examination of Brian, it played a recording of the full 911 call that Brian made on the night of the shooting. Hunt's counsel did not object to any portion of the recording being played for the jury.

¶25 The call began with Brian reporting the general facts of the shooting, such as the address of the restaurant and a description of what had happened: "two guys walked in. They were just talking shit. I don't know what the fuck was going on between them. It sounded like a girl dispute. My friend got shot—my friend got punched right in the face, and they pulled out a gun . . . and shot him. Yeah, I'm with him now. He's on the ground bleeding."

¶26 As the call continued, Brian explained to the operator that N.L. was beginning to lose consciousness and had "blood coming out of his mouth." The operator instructed him to find a clean towel to use in applying pressure to the wound. Brian confirmed: "I have a clean rag, and I'm shoving it on the wound." The operator then told Brian that he needed to perform CPR and talked him through the steps: "Just make sure he's flat on his back, place the heel of your hand on the breastbone in the center of the chest . . . ." Brian followed these instructions and performed CPR, counting aloud with the operator over the phone.

*Jury Instructions*

¶27 At the close of trial, the court instructed the jury on the law governing the case—including instructions on perfect and imperfect self-defense. These instructions were largely taken from the Model Utah Jury Instructions, Second Edition (MUJI). *See* MODEL UTAH JURY INSTRUCTIONS CR531–33, CR1451–52.[3]

¶28 Unsatisfied with the MUJI instructions alone, Hunt's counsel requested an additional instruction specifically informing the jury that, for purposes of self-defense, it does not matter whether there was "real" danger, as long as there was an "appearance of peril." Counsel argued that this instruction was important to Hunt's defense, because Hunt claimed it appeared to him that N.L. was reaching for a gun, even though it turned out that he was wrong. The proposed instruction read:

> You are instructed that actual danger is not necessary
> to establish self-defense. If one is confronted by the
> appearance of peril which arouses in his mind, as a
> reasonable person, and he believes that he is about to

---

[3] The MUJI instructions are drafted by a committee of the Utah Judicial Council with the aim of accurately stating the law "using simple structure and, where possible, words of ordinary meaning." UTAH R. JUD. ADMIN. 3-418.

suffer death or serious bodily injury, or is about to be the victim of a forcible felony, and if a reasonable person in a like situation, seeing and knowing the same facts, would be justified in believing himself or another in danger, his right to self-defense is the same whether such danger is real or merely apparent.

This language was drawn from an almost identical instruction found in *State v. Starks*, 627 P.2d 88, 91 n.2 (Utah 1981).[4]

¶29 The court decided not to include Hunt's proposed instruction, reasoning that it was "duplicative" of the MUJI instructions. And it noted that counsel could "still make the same arguments based upon" the instructions the court would give.

¶30 And during closing arguments, trial counsel did argue this apparent-danger-versus-real-danger distinction to the jury:

And this idea that no gun was found, no gun was seen—nowhere did you hear in any evidence—the judge didn't tell you that [N.L.] must have been armed, and he must have been shot at before he has a right to defend himself. You have the right to defend yourself if it was—from the circumstances that you all have to look at. Put yourself in the situation there, and what was presented? You're dead, bitches, stand up in an angry, aggressive manner. And he said nothing about putting his hand in his pocket. He said he reached around his back, and he believed he was grabbing a weapon. Was that reasonable? Based on his experiences of TV and movies, that's a threatening, hostile manner.

If someone did that to a police officer after threatening a police officer, that police officer is not going to wait for that person to pull his hand around, because then their partners will be going to their house and saying, "We're sorry. Your husband is dead. He hesitated." Nothing in the law requires that. Nothing in the law requires that they prove there was an actual gun, because real danger isn't required. It

---

[4] We identify some differences between Hunt's proposed instruction and the one quoted in *State v. Starks* later in this opinion. *See infra* ¶ 62 n.11.

only needs to be apparent—if it appeared that his life was in danger, if it was reasonable for him to believe after being told "You're dead, bitches" and being stood up in an angry manner, an aggressive manner, and reaching behind his back like he's grabbing a weapon.

Even if he was grabbing a comb, it would not change the fact that at that particular moment, that furtive movement was consistent with making someone believe that they were endangered. And that's what happened. And the conduct afterwards—they would have you believe that somehow he was this cold-blooded killer who just went in there and decided to do this.

¶31 After deliberation, the jury found Hunt guilty of murder and felony discharge of a firearm. Hunt appeals his convictions.

¶32 We have jurisdiction under Utah Code subsection 78A-3-102(3)(i).

**STANDARD OF REVIEW**

¶33 Hunt raises three issues for our consideration.

¶34 First, Hunt challenges the district court's refusal to give his proposed jury instruction. Our precedent regarding the standard of review for a district court's refusal to give jury instructions has caused some confusion. We discuss this issue more fully below. *See infra* ¶¶ 39–42. Here, we review the district court's rejection of Hunt's requested supplemental instruction for an abuse of discretion. This is because Hunt's challenge to the court's refusal is not a legal one—he does not argue that the instructions given were legally incorrect or that he was legally entitled to an instruction that the court refused to give. He argues only that his proposed instruction would have made the law clearer to the jury on an issue that was already covered in other jury instructions. This type of decision falls within the district court's discretion. *See infra* ¶ 47.

¶35 Second, Hunt makes two claims of ineffective assistance of counsel. Because these claims are raised for the first time on appeal, there is no standard of review.

¶36 Third, Hunt argues that these errors, together, prejudiced him. Under the cumulative error doctrine, appellate courts apply "the standard of review applicable to each underlying claim of

error." *State v. Perea*, 2013 UT 68, ¶ 33, 322 P.3d 624 (cleaned up). We reverse only if the cumulative effect of multiple errors undermines our confidence that a fair trial was had. *State v. Martinez-Castellanos*, 2018 UT 46, ¶ 39, 528 P.3d 1038.

## ANALYSIS

¶37 We first address Hunt's argument that the district court should have given his proposed apparent-danger jury instruction. We begin by clarifying the applicable standard of review. We then turn to the merits and conclude that the district court did not abuse its discretion in declining to give the proposed instruction.

¶38 We then consider Hunt's ineffective assistance of counsel claims. Because both are unsuccessful, we then dispose of Hunt's remaining claim of cumulative error because there are no errors to accumulate.

I. THE DISTRICT COURT DID NOT ABUSE ITS DISCRETION IN REFUSING TO GIVE HUNT'S PROPOSED SUPPLEMENTAL JURY INSTRUCTION

### A. The Applicable Standard of Review

¶39 There has been some confusion about the standard of review for a district court's refusal to give a jury instruction. About thirteen years ago, in *Miller v. Utah Department of Transportation*, this court addressed this topic and held that "we review a district court's refusal to give a jury instruction for abuse of discretion. But in certain circumstances, the court's discretion will be strictly cabined." 2012 UT 54, ¶ 13, 285 P.3d 1208 (cleaned up). We gave some examples of when a court's discretion would be "strictly cabined," observing that "a criminal defendant is generally entitled to have the charged offense defined for the jury," and "parties are entitled to have their theories of the case submitted to the jury in the court's instructions, provided there is competent evidence to support them." *Id.* (cleaned up). And we explained that in those circumstances, "refusal constitutes an error of law, and an error of law always constitutes an abuse of discretion." *Id.* ¶ 13 n.1.

¶40 However, the court of appeals recently observed that, "there remains confusion as to when the trial court's discretion will be narrowly constrained such that the refusal to give a jury instruction constitutes an error of law." *State v. Smith*, 2024 UT App 82, ¶ 17 n.3, 550 P.3d 1030 (cleaned up) (collecting cases in which the court of appeals reviewed a district court's refusal to give a requested jury instruction for correctness without mention of *Miller*

or the abuse of discretion standard).[5] The court of appeals "flag[ged] the issue for consideration in a future case, noting the apparent lack of clarity in Utah law as to the appropriate standard of review for the refusal to give a requested jury instruction." *Id.* (cleaned up). We take the court of appeals' point.

¶41   A district court might refuse to give a jury instruction in a variety of contexts, for a variety of reasons. And while we have expounded upon how *Miller* should be applied in various settings,[6] we concede that in a good number of cases involving a district court's refusal to give a jury instruction, we have simply applied the standard of review that corresponds with the nature of the issue presented, without reference to *Miller* or the abuse of discretion standard. *See, e.g., State v. Reece*, 2015 UT 45, ¶ 16, 349 P.3d 712 ("A trial court's refusal to grant a lesser included offense instruction is a question of law, which we review for correctness."(cleaned up)); *State v. Lambdin*, 2017 UT 46, ¶ 11, 424 P.3d 117 (noting "we review

---

[5] The court of appeals listed the following cases: "*State v. Rivera*, 2019 UT App 27, ¶ 14, 440 P.3d 694 (reviewing 'a trial court's refusal to give a requested jury instruction for correctness' with no mention of the abuse of discretion standard set forth in *Miller* (cleaned up)); *State v. Dozah*, 2016 UT App 13, ¶ 12, 368 P.3d 863 (same); *State v. Karren*, 2018 UT App 226, ¶¶ 18, 24, 438 P.3d 18 (identifying the standard of review for refusal to give a jury instruction as abuse of discretion, but concluding that 'the district court did not err' in denying to give the requested jury instruction)."

[6] *See State v. Berriel*, 2013 UT 19, ¶ 8, 299 P.3d 1133 ("'The refusal to give a jury instruction is reviewed for abuse of discretion . . . .' The precise amount of deference we afford on review depends on the type of issue presented." (quoting *Miller*, 2012 UT 54, ¶ 13)); *USA Power, LLC v. PacifiCorp*, 2016 UT 20, ¶ 75 & n.82, 372 P.3d 629 (noting that "in certain circumstances the court's discretion in declining to give jury instructions 'will be strictly cabined'" (quoting *Miller*, 2012 UT 54, ¶ 13) and including footnote providing two specific instances where discretion would be strictly cabined (quoting *Miller*, 2012 UT 54, ¶ 13)); *Arnold v. Grigsby*, 2018 UT 14, ¶ 40, 417 P.3d 606 (reviewing contested jury instruction and noting that a "trial court abuses its discretion when it 'relie[s] on an erroneous conclusion of law'" (quoting *USA Power*, 2016 UT 20, ¶ 75)).

a court's ruling on a proposed jury instruction for correctness" (cleaned up)); *Jensen v. IHC Health Services, Inc.*, 2020 UT 57,¶ 16, 472 P.3d 935 ("We review a trial court's ruling concerning a jury instruction for correctness without deference to its interpretation of the law." (cleaned up)).

¶42 While this is inconsistent with our guidance in *Miller*, it is consistent with the evolution of our treatment of standards of review more generally. For over a decade, we have trended toward assigning standards of review more categorically based on the nature of the issue on appeal—be it factual, legal, mixed, or subject to the district court's discretion. *See, e.g.*, *Sawyer v. Dep't of Workforce Servs.*, 2015 UT 33, ¶ 11, 345 P.3d 1253 ("[I]n our more recent cases we have applied a binary method for determining the appropriate standard of review for mixed questions."); *Randolph v. State*, 2022 UT 34, ¶ 21, 515 P.3d 444 (noting the move away from this court's previous "broad spectrum approach" to determining the appropriate standard of review because of "its tendency to produce indefinite standards that prove difficult to describe and even more difficult to predict and apply" (cleaned up)); *Smith v. Volkswagen SouthTowne, Inc.*, 2022 UT 29, ¶ 40 n.10, 513 P.3d 729 (abrogating an earlier case's holding regarding the applicable standard of review because it had been "overtaken by our streamlining of our standards of review"). And while we stand by the general principles enunciated in *Miller*, any confusion caused by our use of the "strictly cabined" terminology can be avoided by bringing those principles in line with our more categorical, streamlined approach.

¶43 We clarify that the applicable standard of review for jury instruction issues should be determined as it is for any other issue on appeal. In general, the standard of review is based on the nature of the issue on appeal. *State ex rel. E.R.*, 2021 UT 36, ¶ 14, 496 P.3d 58 ("The appropriate standard of review for a lower court's decision is dependent upon the nature of the issue." (cleaned up)). We ask whether the issue presents a legal question, a factual question, a mixed question, or whether it falls in an area over which district courts generally exercise discretion. And the answer to this question determines the standard of review. *See Monarrez v. Utah Dep't of Transp.*, 2016 UT 10, ¶ 7, 368 P.3d 846 (purely "legal questions," such as statutory interpretation and the grant of summary judgment, are "reviewed for correctness"); *State ex rel. E.R.*, 2021 UT 36, ¶ 15 ("We review determinations of fact with a highly deferential standard, overturning the lower court only when

clearly erroneous." (cleaned up)); *Randolph*, 2022 UT 34, ¶¶ 44, 49 (explaining that law-like mixed questions are "reviewed de novo" and fact-like mixed questions are reviewed deferentially and overturned only when they are "clearly erroneous"); *Goggin v. Goggin*, 2013 UT 16, ¶ 26, 299 P.3d 1079 ("The trial court in a divorce action is permitted considerable discretion in adjusting the financial and property interests of the parties . . . .Accordingly, we will not disturb a district court's appointment of marital property unless it is clearly unjust or a clear abuse of discretion." (cleaned up)); *Volkswagen SouthTowne, Inc.*, 2022 UT 29, ¶ 40 ("We apply an abuse of discretion standard in reviewing a [district court's] decision to grant or deny a new trial." (cleaned up)). The same is true for jury instructions. And we clarify that this court's past "broad spectrum approach," *Randolph v. State*, 2022 UT 34, ¶ 21 (cleaned up), characterized by various degrees of discretion—be it "strictly cabin[ed]" or "narrowly constrained"—has been overtaken by our current practices.

¶44  Generally, appellate issues involving jury instructions will be subject to either an abuse of discretion or a correctness standard of review.

¶45  A district court generally has discretion in deciding how it will instruct a jury at trial, as "jury instructions require no particular form so long as they accurately convey the law." *Meeks v. Peng*, 2024 UT 5, ¶ 35, 545 P.3d 226 (cleaned up). If the jury instructions are legally correct, "the precise wording and specificity of jury instructions is left to the sound discretion of the trial court." *Id.* (cleaned up). In other words, parties are entitled to have the jury instructed accurately on the law, but they are "not entitled to have the jury instructed with any particular wording." *State v. Marchet*, 2012 UT App 197, ¶ 17, 284 P.3d 668 (cleaned up). And a trial court may refuse to give a proposed instruction "if the point is properly covered in other instructions." *State v. Maestas*, 2012 UT 46, ¶ 148, 299 P.3d 892 (cleaned up). Jury instruction issues that fall within the district court's discretion will, of course, be subject to an abuse of discretion standard. *See, e.g.*, *Smith*, 2022 UT 29, ¶ 40.

¶46  Other jury instruction issues will present a question of law, subject to a correctness standard. *See, e.g.*, *Monarrez*, 2016 UT 10, ¶ 7. For example, if a criminal defendant asserts that the district court did not provide an instruction to which the defendant was legally entitled (like an instruction on a lesser-included offense or an affirmative defense for which there was an evidentiary basis), or

gave a legally incorrect instruction, the applicable standard of review would be correctness.[7] *See Reece*, 2015 UT 45, ¶ 16 (lesser-included offense); *State v. Dozah*, 2016 UT App 13, ¶¶ 12, 16, 368 P.3d 863 (affirmative defense); *State v. Eyre*, 2021 UT 45, ¶ 13, 500 P.3d 776 (legally erroneous jury instructions).

¶47 With this in mind, we review the district court's decision not to give Hunt's proposed apparent-danger instruction for an abuse of discretion. Hunt does not argue that the jury instructions were legally incorrect without his proposed instruction. Nor does he argue that he was legally entitled to the instruction. Rather, he asserts that self-defense and imperfect self-defense are confusing concepts, and that his proposed instruction would have clarified that actual danger is not necessary in a self-defense claim. Whether to give an additional clarifying instruction is the type of decision that falls within a district court's discretion.

¶48 Thus, we review this issue for an abuse of discretion. And we will affirm if the jury instructions, taken as a whole, accurately instruct the jury on the applicable law.

### B. Hunt's Proposed Jury Instruction

¶49 Hunt argues that the district court abused its discretion by declining to supplement the perfect and imperfect self-defense instructions with his proposed apparent-danger instruction.

¶50 With respect to perfect self-defense, a person is justified in using force "likely to cause death or serious bodily injury only if" the person "reasonably believes that force is necessary to prevent death or serious bodily injury to the individual or another individual as a result of imminent use of unlawful force, or to prevent the commission of a forcible felony." UTAH CODE § 76-2-402(2)(b). A person acts in imperfect self-defense, which reduces a murder conviction to manslaughter, when the person "caused the death of another individual . . . under a reasonable belief that the

---

[7] When the *Miller* court described a district court's discretion as being "strictly cabined," 2012 UT 54, ¶ 13, the examples it gave indicate that it was essentially referring to legal requirements that must be met when instructing a jury, *id.* ¶ 13 & n.1 (explaining, for example, that "a criminal defendant is generally entitled to have the charged offense defined for the jury," and failure to do so "constitutes an error of law, and an error of law always constitutes an abuse of discretion").

circumstances provided a legal justification or excuse for the conduct although the conduct was not legally justifiable or excusable under the existing circumstances." *Id.* § 76-5-203(4)(a), (c). Thus, in a trial where self-defense is at issue, the "ultimate question before the trier of fact remains the reasonableness of a defendant's belief that force was necessary to defend against another's imminent use of unlawful force." *State v. Walker*, 2015 UT App 213, ¶ 10, 358 P.3d 1120.

¶51 Here, the district court instructed the jury on both self-defense and imperfect self-defense with language that mirrored the applicable statutes. The court's self-defense instruction stated in relevant part:

> You must decide whether the defense of Defense-of-Self applies in this case. Under that defense, the defendant is justified in using force against another person when and to the extent that the defendant reasonably believes that force is necessary to defend himself against another person's imminent use of unlawful force. The defendant is justified in using force intended or likely to cause death or serious bodily injury only if the defendant reasonably believes that, (1), force is necessary to prevent death or serious bodily injury to the defendant or a third person as a result of another person's imminent use of unlawful force; or, (2), to prevent the commission of a forcible felony, such as aggravated assault.[8]

¶52 The court provided additional instructions to further explain some of the terms used in the self-defense instruction. To expand on what it meant for a defendant to have a "reasonabl[e] belie[f] that force is necessary," the court provided a definition of "reasonableness." The instruction stated, "Reasonableness shall be determined from the viewpoint of a reasonable person under the then existing circumstances."

¶53 The court also instructed the jury on imperfect self-defense, stating in relevant part:

> You must consider imperfect self-defense only if you find the defendant guilty of murder. Imperfect self-defense is a partial defense to murder. It applies when

---

[8] "Forcible felony" was defined in another instruction.

the defendant caused the death of another while incorrectly, but reasonably, believing that his conduct was legally justified or excused. The effect of the defense is to reduce the level of the offense.

. . . .

In considering the matter of acting with imperfect self-defense, you are instructed that the defendant does not have to establish such a defense by any burden of proof. Rather, if there is some evidence which tends to show that the defendant acted under circumstances where he believed he was entitled to defend himself, although under the law he was not entitled to use deadly force, the State must prove beyond a reasonable doubt that the defendant did not act under such circumstances.

¶54 The instructions also made clear that the burden lies with the State to "prove beyond a reasonable doubt that perfect self-defense does not apply." They likewise explained that the defendant bore no burden to prove imperfect self-defense; instead, "the State must prove beyond a reasonable doubt that imperfect self-defense does not apply."

¶55 Hunt asked the court to supplement these instructions with an additional one that covered much of the same ground, but emphasized that "actual danger" is not necessary for self-defense:

You are instructed that actual danger is not necessary to establish self-defense. If one is confronted by the appearance of peril which arouses in his mind, as a reasonable person, and he believes that he is about to suffer death or serious bodily injury, or is about to be the victim of a forcible felony, and if a reasonable person in a like situation, seeing and knowing the same facts, would be justified in believing himself or another in danger, his right to self-defense is the same whether such danger is real or apparent.

¶56 This instruction was drawn nearly verbatim from a 1981 case, *State v. Starks*, 627 P.2d 88, 91 n.2 (Utah 1981). We say "nearly" verbatim because the second sentence of the proposed instruction modifies some of the language from the *Starks* instruction. *See infra* ¶ 62 n.11.

¶57 The district court declined to give the requested instruction. It concluded that the requested instruction was duplicative of the perfect and imperfect self-defense instructions the parties had agreed upon, and that those instructions adequately conveyed the point Hunt wanted to make.[9]

¶58 Hunt argues that this was an abuse of discretion. He first contends that his proposed instruction "was a correct statement of law."[10] But the issue here is not whether his proposed instruction

---

[9] The district court also correctly observed that in *State v. Starks*, this court did not opine on the general correctness of the instruction. In that case, the defendant was charged with second-degree murder and claimed self-defense at trial. 627 P.2d 88, 89 (Utah 1981). The district court gave jury instructions on self-defense that were "worded in the exact terms of the statute" in place at the time. *Id.* at 90. The defendant asked the court to give an additional instruction that "would have apprised the jury that it could consider defendant's prior knowledge of the violent propensities of the victim in evaluating the reasonableness of defendant's apprehension at the time of the fatal encounter." *Id.* at 91. The district court refused the defendant's requested instruction and instead gave the instruction that Hunt draws upon here. *Id.* at 91 n.2. On appeal, the *Starks* court concluded that "although the instruction given properly informed the jury that defendant must have reasonably believed that the force he used against decedent was necessary to defend himself against decedent's imminent use of unlawful force," the district court had erred in giving it instead of the requested instruction because the given instruction "did not expressly focus the jury's attention on the prior violent acts of the victim which may reasonably have colored defendant's attitude at the time of the encounter." *Id.* at 91 (cleaned up). Thus, in this case, the district court was correct that in *Starks* this court did not opine on the general correctness of Hunt's requested instruction.

[10] Hunt argues that "the court's analysis of the proposed instruction suggested the court disagreed with the principle the instruction articulated." We disagree. At no point did the court say anything suggesting that it thought actual danger was a required element of self-defense, or that the point Hunt wanted to make was legally incorrect. Rather, it ultimately concluded that the point was adequately covered in the other self-defense instructions.

was legally correct. The real question is whether the district court was *required* to give it.

¶59 Hunt further argues that his proposed instruction was necessary to clarify that actual danger is not a prerequisite for self-defense. He does not argue that the court's instructions erroneously suggested that actual danger *was* an element of self-defense—just that his additional instruction was necessary to avoid confusion.

¶60 "A party is not entitled to have the jury instructed with any particular wording." *Marchet*, 2012 UT App 197, ¶ 17 (cleaned up). "So long as they correctly state the law, the precise wording and specificity of jury instructions is left to the sound discretion of the trial court." *Meeks*, 2024 UT 5, ¶ 35 (cleaned up). Moreover, "a district court does not necessarily abuse its discretion when it refuses to give *every* instruction requested by a party." *State v. Devan*, 2024 UT App 193, ¶ 30, 562 P.3d 1233, *cert. denied*, 568 P.3d 261 (Utah 2025). To the contrary, "if the point is properly covered in other instructions," *Maestas*, 2012 UT 46, ¶ 148 (cleaned up), and "the instructions, read as a whole, fairly instruct the jury on applicable law," *Marchet*, 2012 UT App 197, ¶ 17 (cleaned up), the court has discretion to refuse a request for a particular jury instruction. We conclude that the court did not abuse its discretion in refusing the instruction Hunt requested.

¶61 First, the court's instructions on self-defense and imperfect self-defense adequately communicated that actual danger is not an element of self-defense. The jury instructions explained that the defendant need only show that he "*reasonably believe*[*d*] that force was necessary to defend himself." (Emphasis added.) And in line with this instruction, defense counsel was able to argue in closing that a reasonable belief can be based on apparent danger and does not require actual danger.

¶62 Second, much of Hunt's proposed instruction overlapped with the existing self-defense instructions. While Hunt's instruction differed in that it explicitly stated that "actual danger is not necessary to establish self-defense" and that a person's "right to self-defense is the same whether such danger is real or merely apparent," the rest of it duplicated the court's other instructions.[11]

---

[11] We also note that the language used in the proposed instruction was difficult to follow. The instruction is written in

(continued . . .)

¶63 In sum, we conclude that the jury instructions, when read as a whole, fairly instructed the jury on the law of self-defense, both perfect and imperfect. They did not mislead the jury as to the relevant legal standard, nor was the jury insufficiently or erroneously advised on the law. And the instructions adequately conveyed the concepts contained in Hunt's proposed instruction, allowing defense counsel to argue that actual danger is not necessary in a self-defense claim. Beyond that, the court was not required to use the specific phrasing that Hunt requested— especially where the proposed instruction was duplicative of other instructions and not written in particularly clear language. Accordingly, the court did not abuse its discretion by refusing to give the instruction Hunt requested.

## II. TRIAL COUNSEL DID NOT PROVIDE INEFFECTIVE ASSISTANCE

¶64 Hunt argues that he received ineffective assistance of counsel at trial. The Sixth Amendment to the United States Constitution guarantees criminal defendants the effective assistance of counsel. And we evaluate claims of ineffective assistance under the standard articulated by the United States Supreme Court in *Strickland v. Washington*, 466 U.S. 668, 687–96 (1984). *See State v. Sessions*, 2014 UT 44, ¶ 17, 342 P.3d 738.

---

long, run-on sentences, rather than the clear language for which the MUJI committee strives. And the second sentence of the proposed instruction changes the language from *Starks* in a way that does not make sense. The *Starks* instruction says, "If one is confronted by the appearance of peril which arouses in his mind, as a reasonable person, *an honest conviction* that he is about to suffer death or serious bodily injury . . . ." 627 P.2d at 91 n.2 (emphasis added). But the second sentence of the proposed instruction was modified to say: "If one is confronted by the appearance of peril which arouses in his mind, as a reasonable person, *and he believes* that he is about to suffer death or serious bodily injury . . . ." (Emphasis added.) In the original language from *Starks*, "the appearance of peril" is the subject, "arouses" is the verb, and the direct object is "an honest conviction." But in Hunt's proposed instruction, the direct object of the verb is missing. The sentence is incomplete, because it does not say what the "appearance of peril" arouses. Thus, Hunt's instruction would have repeated much of the other self-defense instructions, but in confusing language.

¶65 To prevail on this claim, Hunt must demonstrate that (1) his counsel's performance was deficient in that it "fell below an objective standard of reasonableness," and (2) "the deficient performance prejudiced the defense." *Strickland*, 466 U.S. at 687–88. A defendant's inability to establish either element defeats a claim of ineffective assistance of counsel. *See id.* at 700; *see also Honie v. State*, 2014 UT 19, ¶ 31, 342 P.3d 182.

¶66 Hunt raises two claims of ineffective assistance. He contends that his counsel performed deficiently by (1) failing to object when multiple witnesses used the word "victim" to refer to N.L. during their trial testimony, and (2) failing to object under Utah Rule of Evidence 403 to a portion of the 911 call that was played to the jury, which he argues was especially emotionally charged. We address both issues and conclude that neither amounts to ineffective assistance.

*A. Witnesses' Use of the Term "Victim"*

¶67 Hunt argues that his trial counsel performed deficiently by failing to object when witnesses referred to N.L. as the "victim," because it "undermine[d] the presumption of innocence by habituating the jury to the idea that [N.L.] was the victim before the jury had heard all the evidence."

¶68 To prove deficiency under the first part of the *Strickland* test, a defendant must "show that counsel's representation fell below an objective standard of reasonableness." 466 U.S. at 688. Aware of the benefits of hindsight, the United States Supreme Court cautioned reviewing courts to keep in mind "the variety of circumstances faced by defense counsel" and "the range of legitimate decisions regarding how best to represent a criminal defendant" when assessing counsel's performance. *Id.* at 689.

¶69 Hunt argues that his trial counsel should have objected when the first witness to use the word "victim"—the Rancherito's employee—used it a second time. The employee first testified that "the victim and his buddy" were seated in the restaurant when two men, later identified as Hunt and Jackson, "walked in." Then, he used the term again in explaining that the two men "just walked over to the victim's direction." Hunt contends that when the witness used the term "victim" for the second time, trial counsel should have objected. He reasons that failing to do so was unreasonable because objecting "would have put the State and the court on notice to warn future witnesses not to use the term and to provide a curative instruction if they did." The employee went on

to say "victim" a few more times: he testified that he "looked to where the victim was sitting. And . . . noticed that he was on the floor already;" and that police officers asked him over the phone to see "if the victim was still breathing."

¶70   As the trial progressed, four additional witnesses used the term "victim" to refer to N.L. And Hunt argues it was similarly unreasonable for his trial counsel "to fail to object to each instance, or in the alternative, to [fail] to request a curative instruction from the court at the end of trial." Jackson used the word "victim" to identify N.L. as the person he saw in the coffee shop that day, and again when he explained that after Hunt punched N.L. in the head, "the victim turned and got out of his chair." Brian used the term once in cross-examination to refer to N.L. and twice when recalling and reading aloud a report of his statements to a detective on the night of the shooting. A police officer testified that he observed "the victim" lying on the ground unresponsive. And a second officer testified that the "victim" had been taken to the hospital and had received first aid.

¶71   We have previously "recognize[d] the gravity of referring to witnesses as victims during a trial." *State v. Vallejo*, 2019 UT 38, ¶ 102, 449 P.3d 39. But the meaning of the word, and its potential impact on a trial, varies depending on how and under what circumstances it is used.

¶72   For example, our concern about the use of the word "victim" is heightened when a defendant contends that the charged conduct did not occur at all. *See State v. Arce*, 2024 UT App 43, ¶ 41, 547 P.3d 235. Similarly, in a sexual assault case, referring to the complaining witness as a "victim" can create prejudice when the defense is consent because "it has not yet been conclusively established, prior to the verdict, that there is in fact a victim, and because use of that term might imply that a crime has been committed." *State v. Carrera*, 2022 UT App 100, ¶ 75, 517 P.3d 440 (cleaned up). In circumstances like these, "victim" is used in a manner that conflicts with the presumption of innocence or at least the defendant's theory of the case.

¶73   But in this case, our concern about the witnesses' use of the term is somewhat lessened because none of the witnesses used the term to describe N.L. in relation to Hunt—with Hunt as the aggressor and N.L. as his "victim." Rather, the witnesses generally used "victim" to indicate the person who had been shot.

¶74 Under these circumstances, we conclude it was not objectively unreasonable for defense counsel to forgo an objection. In context, the witnesses' references to N.L. as the "victim" did not necessarily conflict with Hunt's defense of justification. And just because counsel could have decided to make an objection "does not mean counsel *must* make an objection to avoid rendering ineffective assistance." *State v. Hart*, 2020 UT App 25, ¶ 29, 460 P.3d 604; *see also State v. Ray*, 2020 UT 12, ¶ 32, 469 P.3d 871 (explaining that a lawyer is free to "pick his battles").

¶75 Accordingly, because Hunt has not carried his burden of showing that trial counsel performed deficiently, he has failed to satisfy the first part of the *Strickland* test. We therefore reject Hunt's first ineffective assistance claim.

*B. 911 Call*

¶76 Next, Hunt claims that trial counsel provided ineffective assistance in failing to object, on rule 403 grounds, to the recording of a 911 operator leading N.L.'s friend Brian through the process of applying pressure to N.L.'s wound and administering CPR. Hunt argues that a rule 403 objection would have excluded a portion of this call, as it was substantially more prejudicial than probative.

¶77 But even if we assume, without deciding, that the 911 call was more prejudicial than probative and Hunt's counsel was deficient in failing to object to it, Hunt has nevertheless failed to show that the error prejudiced him. So he has not met the second prong of the *Strickland* analysis.

¶78 The second part of the *Strickland* test requires a defendant to show that he was prejudiced by counsel's deficient performance. Prejudice exists when there is a reasonable probability that the case would have had a different outcome had trial counsel not performed deficiently. *State v. Samora*, 2023 UT 5, ¶ 20, 529 P.3d 330. "A reasonable probability is a probability sufficient to undermine confidence in the outcome" of the proceeding. *Strickland*, 466 U.S. at 694. In assessing prejudice, we "consider the totality of the evidence before the judge or jury and then ask if the defendant has met the burden of showing that the decision reached would reasonably likely have been different absent the errors." *State v. Garcia*, 2017 UT 53, ¶ 28, 424 P.3d 171 (cleaned up).

¶79 Hunt's argument is that, had trial counsel objected to the prejudicial portion of the 911 recording being played for the jury, there is a reasonable probability that the jury would have found

that Hunt acted in self-defense and, therefore, would not have convicted him of murder. But the exclusion of this evidence would not have tipped the scales in his favor.

¶80 Jackson and Hunt sought out N.L. They went to the Rancherito's that night, armed with a gun, because they knew N.L. was there. When they arrived at the restaurant, Hunt was the one carrying the weapon, and he was the initial aggressor. Hunt became heated, shouted profanities, and punched N.L. in the head. N.L. stood up, and Hunt immediately shot him dead.

¶81 The only evidence supporting Hunt's theory of the case was Hunt's own testimony. At trial, he claimed that N.L. said, "You're dead, bitches," then shot up out of his seat, and reached to his back for a gun. But no other witnesses heard N.L. make this statement. Similarly, no one else saw N.L. reach behind his back. And the bystander testified that Hunt shot N.L. as he was in the process of standing up, and that he "never made it to a standing position before" the shots were fired. Finally, N.L. did not have a gun in his possession.

¶82 In light of this evidence, we ultimately conclude that even if the jury had not heard the portion of the 911 recording in which Brian rendered first aid to N.L., there is no reasonable probability that the outcome of Hunt's trial would have been different. Although the 911 recording was emotional, we are not persuaded that it evoked such an emotional response that it—as opposed to the other evidence—persuaded the jury to convict. Accordingly, even assuming that Hunt's counsel was deficient in not objecting to that portion of the recording, Hunt cannot establish prejudice and this claim fails. *See Strickland*, 466 U.S. at 694. "An error by counsel, even if professionally unreasonable, does not warrant setting aside the judgment of a criminal proceeding if the error had no effect on the judgment." *State v. Scott*, 2020 UT 13, ¶ 43, 462 P.3d 350 (quoting *Strickland*, 466 U.S. at 691).

## III. CUMULATIVE ERROR

¶83 Hunt argues that the trial court's refusal to include his proposed jury instruction, combined with trial counsel's failure to object to the use of the word "victim" and to the 911 recording, created prejudice when considered together. But because Hunt has not successfully demonstrated multiple errors on appeal, there are no errors to accumulate, and "the doctrine is inapplicable." *State v. Centeno*, 2023 UT 22, ¶ 85 n.10, 537 P.3d 232.

**CONCLUSION**

¶84 We conclude that the district court did not abuse its discretion by refusing to include Hunt's proposed jury instruction. We further conclude that Hunt has failed to prove that he received ineffective assistance of counsel at trial. For these reasons, we affirm.

―――――――――